# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HARRIS, | 1:07-CV-01210-OWW-SMS |
| Plaintiff, | MEMORANDUM DECISION RE: DEFENDANT'S MOTION FOR |
| v. | SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL |
| CITY OF FRESNO, | SUMMARY JUDGMENT/SUMMARY ADJUDICATION |
| Defendant. | |

## I.  INTRODUCTION

Before the court is Defendant City of Fresno's motion for summary judgment or, in the alternative, partial summary judgment/summary adjudication pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The following background facts are taken from the parties' submissions in connection with the motion and other documents on file in this case.[1]

## II.  BACKGROUND

Plaintiff Robert Harris is an African-American male who is employed by the City of Fresno ("City") in its Water Division.  He was initially hired by the City as an Engineering Technician I.  On approximately April 1, 1992, he was promoted to his current

---

[1] "A district court does not, of course, make 'findings of fact' in ruling on a summary judgment motion. Findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998); *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

position as Engineering Technician II. Plaintiff is still employed by the City in its Water Division and he has not sought employment outside of the Water Division or the City since 2002. During his entire tenure with the City, Plaintiff has received nothing but positive performance reviews. (Doc. 39-3 at 2; Doc. 38-6 at 6.)

In his lawsuit against the City, Plaintiff contends that, during his employment with the City, he has been discriminated against and harassed due to his race. Events and statements that compromise Plaintiff's claims of discrimination and harassment are set forth below.

A. <u>Reclassification To Senior Technician</u>

In November 2002, the Personnel Services Department ("HR Department") received a request by Plaintiff to reclassify his job position from Engineering Technician II to Senior Engineering Technician. (Doc. 38-6 at 7.) In response to the request, the HR Department followed its usual procedures by having an analyst: (1) obtain a supervisor's statement of job duties; (2) review documents; and (3) conduct comparative audits. (*Id*.) It is undisputed that the analyst recommended that Plaintiff's job classification remain the same, as Plaintiff's job duties were consistent with those of an Engineering Technician II, and the recommendation was approved. (*Id*.)

In June 2003, the HR department issued a written decision, signed by Juanita Chavez, in which it determined that Plaintiff was properly classified as an Engineering Technician II based upon his current job duties. (*Id*.) After allowing Plaintiff an opportunity to provide additional information supporting his reclassification request, the HR Department's prior decision was reaffirmed on or

about December 8, 2003, as reflected in a writing signed by Chavez, and reaffirmed a third time on May 4, 2004, as reflected in a writing signed by Nancy Kast of HR. (*Id.* at 8.) In doing so, the HR Department concluded that Plaintiff's duties corresponded with the job classification of Engineering Technician II, and did not reach the level of responsibility that is reflective of a Senior Engineering Technician. (*Id.* at 8.)

As to the decision-makers involved in the reclassification denial, Chavez and Kast, Plaintiff testified at his deposition that he was unaware of any personalized racial animus on their part. (*Id.*) Nevertheless, Plaintiff believes (but the City does not concede) that other non-African-American workers with the "same experience and qualifications" as Plaintiff have been reclassified from Engineering Technician II to Senior Engineering Technician and paid at a higher rate. (Pl. Decl. ¶ 11.)

**B.** **Project Manager Position**

In February 2006, the City posted a promotional opportunity for "Project Manager." (Doc. 38-6 at 9.) In 2006, Plaintiff applied for the Project Manager position. (Doc. 39-3 at 4.) As part of the test that all applicants were required to take to be considered for the Project Manager position, Plaintiff was interviewed by an outside, three-member panel which included David Fey, a Caucasian. (Doc. 39-3 at 4; Doc. 38-6 at 10.) After the HR process, which included this outside panel review, Plaintiff was 14th on the eligible list. (Doc. 38-6 at 10.) The HR Department sent a list of the top seven (7) candidates for Project Manager to the Water Division pursuant to the Fresno Municipal Code (Plaintiff was not on the list, as he was 14th). (Doc. 38-6 at 10.) The

**3**

individual ultimately selected by the Water Division, Mark Hughson, a Caucasian, was on the eligible list and was interviewed by the Division. (*Id.*; Doc. 39-3 at 5.)

Prior to serving on the outside panel, Fey once worked for the Water Division alongside Plaintiff. (Pl. Dep. 80:17-18; 80:24-81:8.)  According to Plaintiff, one day during Plaintiff's employment, in Plaintiff's presence, Fey said "Arnold Schwarzenigger" instead of "Schwarzenegger."  (Pl. Dep. 84:2-6.) Plaintiff did not appreciate this comment. (Pl. Dep. 84:9.)

C.    <u>Sick Leave</u>

As of 2004, Plaintiff's sister-in-law was ill with cancer. (Pl. Dep. 253:23-254:1.)  Plaintiff asked his supervisor, Neil Montgomery, for time off from work so that Plaintiff could, along with his wife, visit his sister-in-law. (Doc. 39-3 at 8.)  In response to this request, Montgomery admonished Plaintiff for overuse of sick time and warned Plaintiff that he would have a letter on his desk when he returned from his visit.  (*Id.* at 9.) Because he worried about the repercussions, Plaintiff did not visit his sister-in-law. (*Id.*) The sister-in-law eventually passed away on January 2, 2005, before Plaintiff had an opportunity to see her again. (*Id*; Pl. Dep. 254:24.)  Plaintiff does not dispute that throughout his years with the City, Plaintiff has been cautioned about his use of sick leave and about the need to comply with the City policy. (Doc. 38-6 at 11.)

D.    <u>Request For Safety Boots And Transfer</u>

Montgomery and other supervisors went through training in which they were advised of the utility of slip-on, steel-toe boots for individuals who worked out in the field on a periodic basis.

**4**

(Doc. 38-6 at 11.)   In 2005, Plaintiff started performing well abandonments and he worked in the field on a periodic basis. (*Id.*) Plaintiff asked Montgomery to authorize steel-toe *work* boots (not the slip-on boots) for Plaintiff's use. (*Id.*; Montgomery Decl ¶ 6; Pl. Dep. 10-13.) Montgomery requested that, instead, Plaintiff try the slip-on, steel-toe boots to see if they meet his needs. (Doc. 38-6 at 11.)   According to Plaintiff, these boots were not appropriate.  Jagged objects could penetrate the bottom sole of the slip-on boots because the bottom sole was not thick enough. (Doc. 39-3 at 6.)   Rather than the slip-on, steel-toe boots, Plaintiff wanted "work boots" or "safety boots" which, apparently, have a thicker sole.

According to Plaintiff, on a prior occasion, Montgomery had authorized safety boots for a man named "Buster" who Plaintiff believes is Hispanic or Latino. (Pl. Dep. 123:18-20; 124:6-7.) While Montgomery did not authorize safety boots for Plaintiff's use, unknown to Montgomery, Plaintiff later acquired authorization for safety boots from Montgomery's superior, Lon Martin. (Doc. 39-3 at 7; Pl. Dep. 136:24-25.)   The City does not dispute that third party contractors, who Plaintiff had to interact with, required him to wear safety boots while on-site. (Doc. 39-3 at 6.)

Shortly after Plaintiff secured authorization from Martin, there was a brief conversation in the parking lot between Plaintiff, Martin and Montgomery.   (Doc. 39-3 at 7.)   When Montgomery's failure to issue the safety boot authorization came up, Montgomery became visibly angry and told Martin that he wanted Plaintiff out of his department. (Doc. 39-3 at 7.)   Montgomery admits that he "became increasingly frustrated" after it was

**5**

revealed that Plaintiff had "obtained approval elsewhere" and Plaintiff continued to take Montgomery's time on this issue. (Montgomery Decl. ¶ 7.)

According to Martin, after this conversation in the parking lot, he had discussions and/or meetings with Plaintiff, Plaintiff's union representative, Garth Gaddy, Montgomery, and others as to the situation and the potential solutions. (Martin Decl. ¶ 6.) According to Martin, he believed that Plaintiff was having ongoing disputes with Montgomery. (Martin Decl. ¶ 5.) Plaintiff was transferred, within the Water Division, to Gaddy's supervision in the Telemetry Section. (Doc. 38-6 at 12-13; Doc. 39-3 at 7; Gaddy Decl. ¶ 2.) According to Martin, he believed Gaddy would be a better fit as supervisor, and he wanted Plaintiff to continue performing well abandonments. (Martin Decl. ¶ 7.)[2] According to Plaintiff, he has spent increased time in the field as a result of the transfer, and has not been able to "display his full repertoire of skills and abilities." (Doc. 38-6 at 13.) Plaintiff protested the transfer (Doc. 39-3 at 7), and he feels isolated from the rest of his team in his new section (Pl. Decl. ¶ 21.) He admits, however, that he has had no problems with Gaddy's supervision and has not been the subject of any negative reviews or disciplinary conduct. (Doc. 38-6 at 13.)

E.    **Alleged Improper Racial Comments**

Prior to his transfer, and allegedly throughout his employment, Plaintiff has heard several comments which he finds

---

[2] Plaintiff is not the only employee Martin has transferred to another supervisor. (Martin Decl. ¶ 9.)

objectionable.

1. <u>Denis Peyton</u>

   a. "<u>I got your back; white power, brother</u>"

Peyton worked in the City's Water Division. Peyton left the City's employ in 2002. (Doc. 38-6 at 4.) It is undisputed that, while employed by the City, Peyton reviewed some of Plaintiff's work. (Doc. 39-3 at 2.)

At his deposition, Plaintiff recalled a conversation that occurred in the mid-90's between Martin McIntyre and Peyton. Plaintiff overheard Peyton say to McIntyre: "Hey, man, I got your back; white power, brother." (Pl. Dep. 166:24-25.)

   b. "<u>Okay, back to work slave</u>"

Later, in 2000, Plaintiff was having a conversation with Peyton and two coworkers, Rick and Donna. (Doc. 39-3 at 3.) Just after this conversation concluded, and as Rick and Donna were walking away, Peyton stated "Okay, back to work slave." (*Id.*) Plaintiff drafted an e-mail to Montgomery in which Plaintiff purported to document the conversation. (Pl. Dep. Ex. 18.) As stated in Plaintiff's e-mail, he asked Peyton what he meant by the comment and Peyton responded that "Rick was the slave/indentured slave becasue (sic) he is paid." (*Id.*) Plaintiff felt that Peyton was referring to Plaintiff. (Pl. Dep. 171:9.) Ultimately, after an investigation into the matter, Peyton was advised that he should be sensitive about comments made in the presence of coworkers. (Montgomery Decl. ¶ 11, Ex. A.)

   c. "<u>Schwarzenigger</u>"

According to Plaintiff, Montgomery and Peyton were once discussing movies and Peyton said "something about Arnold

**7**

'Schwarzenigger.' And I said, What did you say? And he got quiet and that was it." (Pl. Dep. 62:20-22.)

### d. "Black man"

In 2001, Peyton attended a work meeting with others. Upon concluding the meeting, as he was leaving, Peyton walked past Plaintiff and, according to Plaintiff, Peyton uttered the words "black man." (Pl. Dep. 175:11-15, Ex. 20.) Plaintiff asked Peyton what he said, and Peyton replied with "nothing." (Pl. Dep. 176:10, Ex. 20.) In Plaintiff's words, the "black man" utterance was a "mumble" and "inaudible." (Pl. Dep. 177:24-178:1.) The matter was investigated (Montgomery Decl. ¶ 3), and the Water Division concluded that "it is unknown if the words were spoken or not" (Montgomery Decl. Ex. B).

### 2. Robert Little

### a. "There are niggers and then there are blacks"

Little worked for the City as a Water Supervisor I. (Doc. 39-3 at 3.) Sometime in the late 1990's to 2002 time-frame (Doc. 38-6 at 4; Little Decl. ¶ 2), Plaintiff had a conversation with Little in which Little stated "there are niggers and then are blacks." (Pl. Dep. 182:15-16.) Neither party disputes that such a comment was made. Indeed, Little admits in his declaration:

> In the late 1990's or 2000-01, I recall a conversation with Plaintiff in which Plaintiff was upset by Senator John McCain's use of the term 'gooks.' I indicated that Plaintiff had to look at the situation from Mr. McCain's perspective as a prisoner of war, and that does not mean he categorized all Asians by that term. Later that day, the conversation continued and I stated something to the effect that there are good and bad categorizations within each race: whites and honkies, hispanics and spics, asians and gooks, blacks and niggers....

(Little Decl. ¶ 2.) Over a year later (Pl. Dep. 185:2-3), as

8

Plaintiff recalls, Little told Plaintiff about an employee who was fired for using the word "niggardly" in a public meeting (Pl. Dep. 185:22-24;192:8).

   **b.   "<u>Niggardly</u>"**

According to Plaintiff, Little told him "I got a joke for you" and Plaintiff stated he did not "want to hear your jokes and you know what I'm talking about." (Pl. Dep. 186:6-8.) Little indicated "it's not like that at all" (Pl. Dep. 186:9), Plaintiff agreed to listen, and Little said "What do you think of a black man getting fired for using the word 'niggardly'? And I asked him, Didn't I just tell you not to go there? Didn't I just tell you not to do that? He said, Well, don't you think it's funny? It's not the same. 'Niggardly' and 'nigger' is not the same." (Pl. Dep. 185:11-18.) Later, Little provided Plaintiff with documentation on the word "niggardly" and eventually the dictionary was brought out. (Pl. Dep. 190:6-11; 190:16-191:6; 193:15-19.)

In his declaration, Little recounts the situation differently:

> In approximately 2001-2002, I recall that Plaintiff brought up a story about a politician's use of the term 'niggardly.' I did not know what the word meant, so Plaintiff and I looked it up together.  Thereafter, I explained that according to the dictionary the term was not derived from the term 'nigger' and had a different meaning,  and that Plaintiff should therefore not be so offended by its use.  Because Plaintiff appeared upset by the  term  and  our  conversation,  I  discussed  the conversation with an African-American supervisor in the Department, Jim Wilson, and Mr. Wilson advised me that there was nothing to worry about.

(Little Decl. ¶ 3.)  At his deposition, Montgomery recalled that, before the initiation of Plaintiff's lawsuit, someone told him (Montgomery)  that  Little  used  the  word  "nigger"  in  front  of Plaintiff.  (Doc. 39-3 at 4; Montgomery Dep. 47:14.)  Montgomery

testified that he did not pursue any action after hearing this: "What – there's nothing for me to do. I don't even know who I heard it from. There are 150 people in the water yard, and rumors and discussion go, and you hear things. You have no idea whether there's a basis for them. So, no, I didn't do anything." (Montgomery Dep. 48:1-10.).

### 3. <u>Dick Short</u>

#### a. "<u>Boy</u>"

According to Plaintiff's testimony, Dick Short is a water production supervisor. (Pl. Dep. 199:25-200:1). It is undisputed that, from 2004 to 2006, Short used the word "boy" more than once when referring to African-American men. (Doc. 39-3 at 8.) When asked about those occasions, Plaintiff testified that, on one occasion, when talking about Tiger Woods, Short said "that boy is good." (Pl. Dep. 57:8.) On another occasion, Short referred to some African-American man as "a big boy." (Pl. Dep. 55:22-23.)

#### b. "<u>If you can't get your niggers to do this, I'll get mine</u>."

According to Plaintiff, at some point in time, Short said to another individual, "[i]f you can't get your niggers to do this, I'll get mine." (Doc. 39-3 at 9; Pl. Dep. 325:1-4.) The individual to whom Short was speaking is believed to be Kenny Jennings, a Caucasian. (Pl. Dep. 325:20-1.)

### 4. <u>Montgomery</u>

On March 12, 2004, in response to a group e-mail from Leslie Smith, an executive secretary, about a "slotted map box holder thingie" and a "hanging/pull down map holder thingie," Montgomery wrote back that Plaintiff "understands technical terms such as

'holder thingie.'" (Pl. Dep. Ex. 24, Montgomery Decl. ¶ 14.)
Plaintiff did not find any humor in Montgomery's e-mail. (Pl. Dep. Ex. 24.)

F.  **Administrative Remedies And Complaint**

It is undisputed that Plaintiff filed a single complaint with the DFEH on or about August 21, 2006. (Doc. 38-6.)[3] Plaintiff filed an initial complaint in federal court on August 20, 2007 (Doc. 1) and a first amended complaint on March 5, 2008 (Doc. 13). Plaintiff's first amended complaint, the operative pleading, contains five claims, and they are: (1) disparate impact discrimination based on race in violation of Title VII, 42 U.S.C. § 2000e et seq.; (2) disparate treatment based on race in violation of Title VII; (3) retaliation in violation of Title VII; (4) deprivation of civil rights under 42 U.S.C § 1981; (5) and race discrimination and harassment under California's Fair Employment and Housing Act ("FEHA"). (Doc. 13 at 1.)

G.  **The City's Motion**

Plaintiff alleges causes of action for violations of Title VII, FEHA, and 42 U.S.C. § 1981. The City moves for summary judgment on the grounds that "Plaintiff cannot maintain these claims as they are barred by the statute of limitations; Plaintiff cannot satisfy the requisite elements; and he cannot satisfy *Monell*. Plaintiff cannot establish any materially adverse action was taken against him for racial or retaliatory reasons, or that he

_____

[3] **In addition, the Scheduling Conference Order in this case (Doc. 18) contains admitted facts, and one of them reads: "Plaintiff filed a complaint with the DFEH/EEOC on or about August 21, 2006."**

was the subject of any severe or pervasive harassment." (Doc. 25 at 2.) The City also moves for summary adjudication on several listed issues, some of which overlap with the foregoing. (*Id.*)

## III.   <u>STANDARD OF DECISION</u>

Summary judgment, or summary adjudication, is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir.2007). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise

12

provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *Id*. (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

## IV. DISCUSSION AND ANALYSIS

### A. Disparate Impact Claim

Claims of disparate impact "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-3 (2003) (internal quotation marks omitted). "To establish a prima facie case of disparate impact under Title VII, the plaintiff[] must: (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact." *Hemmings v.*

13

*Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002). "A plaintiff establishes a prima facie case of disparate impact by showing a significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion." *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002). In a disparate impact case, "[t]he plaintiff must actually prove the discriminatory impact at issue." *Stout*, 276 F.3d at 1122 (internal quotation marks omitted).

The City argues that, in discovery, Plaintiff was unable to identify any policy or practice of the City that has a disparate impact on African-Americans or come forth with any evidence that supports this claim. Plaintiff testified that he could not identify any "written policy" of the City that, when applied by the City, adversely impacted African-Americans. (Pl. Dep. 271:16.) When questioned further, Plaintiff explained the "policy" or procedure of the City he believed adversely affected African-Americans: "I have to say that as a personal and a political policy that's not even written, it's how people are, it's what they believe and they do what they feel they have the authority to do, and they do it under the color of law or under the authority of their positions." (Pl. Dep. 271:22-272:2.) This conclusory testimony is insufficient to create a triable issue that the City has some employment practice, selection criterion, or custom that has a significant racially adverse impact on a protected class or group. In a written discovery response (Rubin Decl. Ex. C at 11), Plaintiff provided no description of what specific employment practice or criterion he believed exists, or how it disparately impacted a protected class or group.

**14**

Plaintiff does not even mention his disparate impact claim in his opposition brief.  Plaintiff's only apparent attempt to salvage this claim is his response to the City's separate statement of undisputed material facts.  There, Plaintiff briefly states: "Plaintiff testified that over his time with Defendant, it has become clear to him that only non African-Americans are promoted through the ranks. Plaintiff indicated that there is discrimination in the promotion process." (Doc. 38-6 at 21.)  In support of these *arguments*, Plaintiff cites to paragraph twelve (12) of his declaration.

Paragraph 12 of Plaintiff's declaration states, "[a]s a result of these experiences, I have concluded that Defendant's promotional process has the effect of discriminating against African Americans." The "experiences" that Plaintiff refers to are his own alleged experiences in not being awarded the Project Manager position, which was given to a Caucasian candidate, even though Plaintiff felt qualified for the job, and not being reclassified as a Senior Engineering Technician despite requesting reclassification. According to Plaintiff, other non-African-American workers, "including Neil Montgomery and Litu Bucu, have been re-classified" to the Senior Engineering position and they allegedly have the "same experience and qualifications" as Plaintiff. (Pl. Decl. ¶ 11.)

Plaintiff's declaration is insufficient to create a triable issue.  Plaintiff has not identified *one* other African-American who, allegedly, has not been promoted on account of race, nor has Plaintiff pointed to any evidence which suggests that, for promotions, African-Americans are disproportionately affected when

compared to other racial groups. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) ("Summary judgment is appropriate when statistics do not support a disparate impact analysis"); *see also Lawrence v. Dep't of Interior*, 525 F.3d 916, 921 (9th Cir. 2008) (affirming grant of summary judgment in favor of the employer on a disparate impact claim, stating that plaintiff "presented evidence that the BIA's policy affected some Indian employees, but he presented no evidence that the failure to provide actual and timely notice disproportionately affected Indians more than other racial groups."); *Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002) (recognizing that "[s]tatistical evidence is used to demonstrate how a particular employment practice causes a protected minority group to be under represented in a specific area of employment (for example, hiring or promotion)" and stating that the "statistical analysis must show a disparity that is sufficiently substantial") (internal quotation marks omitted).

In addition, to advance a Title VII disparate impact claim, the employee must be able to pinpoint some "facially neutral employment practice," *Paige*, 291 F.3d at 1145 (internal quotation marks omitted), that is causing the alleged disparate impact, and Plaintiff is unable to do so here. Although Plaintiff conclusorily claims there is discrimination in the "promotion process," Plaintiff has not demonstrated (or even attempted to demonstrate) what compromises the discriminatory promotion process nor does he describe the "face" of this alleged practice to permit an evaluation of its impact.

For the reasons discussed above, with respect to his disparate impact claim, Plaintiff has failed to create a genuine issue of

material fact.  Summary judgment on this claim is GRANTED in favor of the City.

B.  <u>Disparate Treatment Claim</u>

Federal law prohibits an employer from taking an adverse employment action against an employee because of his or her race. *See* 42 U.S.C. § 2000e-2; *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003).  "For a prima facie case, [the plaintiff] must offer evidence that give[s] rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (footnotes omitted).  In other words, "the plaintiff first must establish a prima facie case of discrimination by coming forward with evidence that an employer considered race in its employment decisions." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 837 (9th Cir. 2006).

To create a prima facie case under the *McDonnell Douglas* framework, the plaintiff "must show that: (1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment." *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002); *see also Leong*, 347 F.3d at 1124.  If the "plaintiff establishes a prima facie case" a presumption of discrimination arises and "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision." *Leong*, 347 F.3d at 1124. "If the employer offers a nondiscriminatory reason, the burden returns to the

17

plaintiff to show that the articulated reason is a pretext for discrimination." *Id*. The plaintiff can show that the employer's articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Villiarimo v. Aloha Island, Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (internal quotation marks omitted).

Apart from the *McDonnell Douglas* framework, a plaintiff can raise an inference of discrimination (*i.e.*, create a prima facie case) with circumstantial or direct evidence of discriminatory intent. *Vasquez*, 349 F.3d at 640. If the plaintiff attempts to do so and the employer provides evidence of a legitimate, nondiscriminatory reason for the adverse employment action, to avoid summary judgment, the plaintiff's evidence must be such as to create a triable issue as to discriminatory intent. *See McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1123 (9th Cir. 2004) (recognizing that whether an employee uses the *McDonnell Douglas* approach or "relies on direct or circumstantial evidence of discriminatory intent," the employee must "counter" the employer's legitimate, nondiscriminatory reason for its adverse action in such a manner as to create a genuine issue as to discriminatory intent); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (recognizing that whether the employee uses the *McDonnell Douglas* framework or other evidence to create a prima facie case, when the employer offers a legitimate, nondiscriminatory reason for its adverse action, the question is whether a "rational trier of fact could" conclude that the "employer's action was taken for impermissibly

18

discriminatory reasons"); *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 473 & n.16 (9th Cir. 1991).

### 1.    Statute Of Limitations

The City asserts that Plaintiff's Title VII race discrimination claim is barred by the statute of limitations. The City seeks summary adjudication on the issue that Plaintiff "cannot pursue alleged adverse employment actions that took place prior to October 25, 2005, for purposes of Title VII." (Doc.  25 at 2.)

Any adverse employment action "which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed" and, as such, "it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). "Discrimination claims under Title VII ordinarily must be filed with the EEOC within 180 days of the date on which the alleged discriminatory practice occurred. 42 U.S.C. § 2000e-5(e)(1). However, if the claimant first 'institutes proceedings' with a state agency that enforces its own discrimination laws-a so-called 'deferral' state-then the period for filing claims with the EEOC is extended to 300 days." *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1174 (9th Cir. 1999).

California is a deferral state. *Josephs v. Pac. Bell*, 443 F.3d 1050, 1054 (9th Cir. 2006); *Bouman v. Block*, 940 F.2d 1211, 1219-20 (9th Cir. 1991). Accordingly, the 300-day limitation period applies.  It is undisputed that Plaintiff filed his charge of discrimination with the DFEH, a local agency, on or about August 21, 2006. Three hundred days prior to that is October 25, 2005, a fact which neither party disputes.  The alleged adverse employment

actions must fall "within the 300-day limit" *Bouman*, 940 F.2d at 1219, or else they are barred by the statute of limitations. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir. 2002) ("[T]he statute of limitations runs separately from each discrete act.").

### a. Reclassification

Plaintiff alleges he was improperly denied reclassification in the 2003-2004 time-frame. (Doc. 38-6.) More specifically, it is undisputed that after he submitted a request for reclassification in November 2002, the HR department decided, in June 2003, not to reclassify Plaintiff, and, after Plaintiff had an opportunity to submit more information, the HR's decision was reaffirmed on December 8, 2003 and again on May 4, 2004. (Doc. 38-6 at 7-8.) Plaintiff claims that these decisions were based on his race. These three decisions all occurred well outside the 300-day limit. In hopes of escaping the statute of limitations, Plaintiff raises two arguments.

First, Plaintiff argues that he requested "re-classification to this position [Senior Engineering Technician] multiple times, both orally and in writing (AUMF #22)" and his requests were "repeatedly denied." (Doc. 38-5 at 9.) Plaintiff makes this brief argument suggesting that the City made an additional decision denying his reclassification – apart from the three time-barred decisions – and this decision fell within the statute of limitations period. Plaintiff's argument, and the asserted

evidence supporting it, does not overcome the City's statute of limitations defense.

Plaintiff does not address the statute of limitations directly, *i.e.*, Plaintiff does not even state or argue that any of the "repeated[]" denials *occurred within the 300-day limit*. The evidence Plaintiff relies on in connection with "AUMF # 22" is deposition testimony from Plaintiff which does not discuss any additional denial of reclassification beyond the three time-barred denials discussed above.

Plaintiff's declaration is equally unavailing. Plaintiff declares: "Since 1995, I have been performing the duties of Senior Engineering Technician, but have remained classified as an Engineering Technician II, despite multiple requests to be re-classified." (Pl. Decl. ¶ 10.) There is no mention of the dates of these alleged "requests." There is also no statement in Plaintiff's declaration that actual decisions were made in response to these "multiple" requests. Plaintiff does not provide the names of any alleged decision-makers involved or other salient details which would permit an inference that an actual decision was made within the 300-day limit in response to his asserted "multiple requests." For these reasons, Plaintiff's "repeatedly denied" argument does not overcome the statute of limitations issue.

Second, Plaintiff argues that until his recent transfer to Gaddy's supervision, his pay was less than what it should have been had he been properly classified as a Senior Engineering Technician. (Doc. 38-5 at 9.) In other words, Plaintiff argues that even though the adverse employment action (the decision not to reclassify him) occurred *outside* the statute of limitations period, the *effect* of

that decision (the inequitable compensation level) was experienced *within* the statute of limitations period. Under this theory, Plaintiff was underpaid until the time he was transferred. From the briefing and declarations, it appears that Plaintiff was transferred some time around December 2005 (which is after October 25, 2005), and so the effect (the decreased compensation level) could have occurred within the 300-day limit.[4]

The statute of limitations runs separately from each discrete discriminatory act, not the ill effect of the act. *See Morgan*, 536 U.S. at 114; *Evans*, 431 U.S. at 558; *Garcia v. Brockway*, 526 F.3d 456, 462-63 (9th Cir. 2008). This is the usual rule. When applied in this case, this rule would eviscerate Plaintiff's argument and bar his disparate treatment claim to the extent it is based on the three decisions (with the most recent occurring in May 2004) to deny Plaintiff's reclassification request. However, a recent act passed by Congress, which neither party discusses, may impact the analysis.

On January 29, 2009, the Lilly Ledbetter Fair Pay Act of 2009 (Pub. L. No. 111-2) was enacted into law. It amended 42 U.S.C. § 2000e-5(e). As amended, that section now provides:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice,

---

[4] Both Montgomery and Martin, in their respective declarations, place the parking lot work boot discussion, which preceded the transfer, in November/December 2005. In his DFEH complaint, Plaintiff places the transfer on or about late December 2005. (Doc. 35 Ex. D.)

> *or when an individual is affected by application of a*
> *discriminatory compensation decision or other practice,*
> *including each time wages, benefits, or other*
> *compensation is paid, resulting in whole or in part from*
> *such a decision or other practice.*

42 U.S.C. § 2000e-5(e)(3)(A) (emphasis added). Congress deemed this amendment retroactive to May 28, 2007: "[t]his Act, and the amendments made by this Act, take effect as if enacted on May 28, 2007 and apply to all claims of discrimination in compensation under title VII of the Civil Rights Act of 1964 . . . . that are pending on or after that date." Pub. L. 111-2, § 6. The amendment was in response to *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).

In *Ledbetter*, the Supreme Court analyzed when the statute of limitations begins to run on an employer's "pay-setting decision" that is allegedly discriminatory on the basis of sex. *Ledbetter*, 550 U.S. at 621. The pay-setting decisions in *Ledbetter* were made outside the statute of limitations period, but the effects of those decisions, the receipt of reduced compensation, continued into the limitations period. *Id.* at 623, 628. Drawing on prior precedent, the Court concluded that the "charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." *Id.* at 628. "Because a pay-setting decision is a 'discrete act,' it follows that the period for filing an EEOC charge begins when the act occurs." *Id.* at 621. With respect to unlawful discrimination in compensation, Congress disagreed with this analysis as evidenced by

the Lilly Ledbetter Fair Pay Act. Now, as a result of the Act, for purposes of claims of discrimination in compensation, the ill effect of a prior discriminatory compensation decision or practice can be considered in the statute of limitations analysis.

Plaintiff's lawsuit was filed after May 28, 2007, after the Ledbetter retroactive date. The amendment applies in this case. Plaintiff has not strictly labeled his claim as one for discrimination in compensation. The substance of his claim, however, is that based on his qualifications and experience, he should have been classified as a Senior Engineering Technician and paid accordingly (*i.e.*, earning more money). Plaintiff alleges that the decision not to reclassify him as a Senior Engineering Technician was illegally motivated by his race. According to Plaintiff, he continued to receive less pay (*i.e.*, pay not commensurate with a Senior Engineering Technician position) until he was transferred to Gaddy's supervision. No party has discussed whether and to what extent the Lilly Ledbetter Fair Pay Act impacts the statute of limitations issue in this case. Given that neither party has raised or briefed this issue, and because the City's motion can be decided on another ground, it is unnecessary to decide whether the Lilly Ledbetter Fair Pay Act brings the reclassification denials within the statute of limitations.

b. <u>Project Manager</u>

The City does not contend that the decision to select another candidate besides Plaintiff for the Project Manager position fell outside the 300-day limit. The parties do not dispute that the City posted the opportunity for Project Manager position in 2006,

**24**

a date within (or not outside) the 300-day limit. The City's motion for summary adjudication on the statute of limitations issue is DENIED to the extent it pertains to the non-selection of Plaintiff for the posted Project Manager position.

### c. Sick Leave

In response to Plaintiff's request for time off to visit his sister-in-law, Montgomery admonished Plaintiff for overuse of sick time and warned Plaintiff that he would have a letter on his desk when he returned from his visit. (Doc. 39-3 at 9.) According to the City, Plaintiff maintained at his deposition that he considered Montgomery's admonishment as a discriminatory act based on race. This event had to have occurred prior to January 2, 2005 (when the sister-in-law passed away). Plaintiff cannot use Montgomery's admonishment, or Montgomery's warning about having a letter on Plaintiff's desk, as a discrete, compensable adverse employment action, as it is time-barred. Assuming Plaintiff advances such a claim, summary judgment on this claim is GRANTED in favor of the City.

### d. Refusal To Allow Plaintiff To Change His Training Class

According to the City, Plaintiff testified that he believes Montgomery's refusal, in April/May 2005, to allow Plaintiff to change a training class was an adverse employment action based on his race. Plaintiff alleges Montgomery "refused to allow him to change his training class in April/May 2005." (Doc. 38-6 at 2.) In light of Plaintiff's opposition briefing, it does not appear he relies on this event to support his race discrimination claim. In

any event, this event is time-barred and cannot be used as a discrete, actionable act of discrimination. Assuming Plaintiff advances such a claim, summary judgment on this claim is GRANTED in favor of the City.

### e. Work Boots And Transfer

The City does not contend that the alleged refusal to authorize work boots and the transfer of Plaintiff to another section fell outside the 300-day limit. Nor does the evidence support such an inference. The City's motion for summary adjudication on the statute of limitations issue is DENIED to the extent it pertains to the work boot incident and the transfer of Plaintiff to another section.

### 2. The Elements Of The Claim

The City contends that, to the extent Plaintiff's Title VII race discrimination claim survives the statute of limitations, it nonetheless fails because Plaintiff cannot satisfy the requisite elements.

### a. Reclassification

The City argues that there is no evidence that the City's decision to deny his reclassification request was motivated by his race. Plaintiff testified at his deposition that he has was unaware of any personalized racial animus on the part of the decision-makers involved, Juanita Chavez and Nancy Kast.

In support of his prima facie case, Plaintiff argues: (1) he "was performing all the job duties and functions of a Senior Engineering Technician," but was denied reclassification; and (2) "Non African-American workers with the same experience and skills

were re-classed into this position." (Doc. 38-5 at 9.)  In his declaration, Plaintiff identified these non-African-American workers as Montgomery and Litu Bucu. For several reasons, Plaintiff's argument is unpersuasive.

First, although Plaintiff *argues* he was performing the job duties and functions of a Senior Engineering Technician, Plaintiff does not point to any *evidence* that shows how these "job duties and functions" coincide with what the employer considers or designates as the requisite job duties and functions of a classified Senior Engineering Technician. Second, although Plaintiff's declaration states, in a conclusory fashion, that Montgomery and Bucu had the "same experience and qualifications" as Plaintiff and were re-classed to the Senior Engineering Technician position (Pl. Decl. ¶ 11), Plaintiff does not explain or elaborate on what "experience" and "qualifications" he is even talking about, or how their "experience" and "qualifications" are comparable to his own. Nor does Plaintiff point to any evidence showing that his job duties and functions were similar to Montgomery and Bucu's job duties and functions.

Even assuming, *arguendo*, Plaintiff could show a prima facie case, the City has advanced a legitimate justification for the decision. It is undisputed that an independent personnel analyst recommended that Plaintiff's job classification stay the same because Plaintiff's job duties were consistent with those of an Engineering Technician II. (Doc. 38-6 at 7.)  It is also undisputed that HR issued a decision in June 2003 in which it determined that Plaintiff was properly classified as an Engineering Technician II

27

based upon his job duties. (Doc. 38-6 at 7.)  This decision was affirmed twice.

Plaintiff has not advanced sufficient evidence that the City's determination that his job duties were those of an Engineering Technician II, not a Senior Engineering Technician, was a pretext for unlawful race discrimination.  Although Plaintiff insinuates that the City erred in its determination that his job duties corresponded to an Engineering Technician II position, this does not demonstrate that the City's determination was pretextual. *See Villiarimo*, 281 F.3d at 1063 ("Courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (internal quotation marks omitted); *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1285 (9th Cir. 2000) ("That Quaker made unwise business judgments or that it used a faulty evaluation system does not support the inference that Quaker discriminated on the basis of age."); *Green v. Maricopa County Cmty. Coll. Sch. Dist.*, 265 F. Supp. 2d 1110, 1128 (D. Ariz. 2003) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision.") (internal quotation marks omitted).

In the face of the City's legitimate justification, Plaintiff has not demonstrated pretext or otherwise created a triable issue that he was denied reclassification because of his race. Summary judgment in favor of the City on this claim is GRANTED.

b.   Project Manager

The City contends that Plaintiff has no evidence to support his claim that not selecting him for the 2006 Project Manager position was based on his race. Plaintiff ranked 14th on the list of applicants (something which Plaintiff does not dispute), and only the top seven were eligible for the position (which Plaintiff does not dispute). These undisputed facts do not establish any discrimination.

To establish a prima facie case, Plaintiff "must show that: (1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment." *Kang*, 296 F.3d at 818. Here, the adverse employment action is the City's decision not to select Plaintiff for the Project Manager position.

In support of his prima facie case, Plaintiff claims that he was qualified for the job because he was invited to take the employment test (*i.e.*, interview before a panel). Plaintiff also argues that he had "overwhelming experience" (without describing that particular experience) and that he had been performing the duties associated with the position (without pointing to relevant evidence) for some time already,[5] which made him a solid candidate.

---

[5] The City believes Plaintiff is attempting to assert a distinct intentional discrimination claim, and a retaliation claim, based on the theory that, since as far back as 1994, he has not been given a project manager position or classification or paid commensurate with a project manager. It is not clear that Plaintiff is really making such claims. The evidence shows, and Plaintiff does not dispute, that he did not apply to become a project manager until the posted position arose in 2006. (Doc. 38-6 at 9.) There is

29

1   (Doc. 38-5 at 10.)  Plaintiff also points out that a non-African-
2   American was ultimately selected for the position.

3       Plaintiff points to other evidence (outside the *McDonnell*
4   *Douglas* framework) in support of his prima facie case.  Plaintiff
5   correctly notes that one of the three outside interviewers in the
6   selection process was Fey.  At some point during Plaintiff's
7   employment, when Fey also worked in the Water Division, when
8   pronouncing Arnold Schwarzenegger's name Fey said "Schwarzenigger"
9   in Plaintiff's presence.

10      Whether viewed separately or in the aggregate, Plaintiff's
11  evidence does not suggest that he was not selected for the Project
12  Manager position because of his race.

13      While Plaintiff, along with other candidates, may have been
14  invited to initially interview, Plaintiff's subjective belief,
15  articulated in a conclusory fashion, that he was qualified for the
16  position does not establish that he was as qualified as the

17

18  no evidence that the City made an adverse employment decision to
19  deny Plaintiff a position for which he never applied.  At his
20  deposition, Plaintiff admitted that he "can't say" (Pl. Dep. 69:15)
21  that there was some decision-maker involved since 1994 who decided
    to keep Plaintiff out of a project manager position or deny him pay
22  commensurate with such a position; rather, Plaintiff believes his
    duties warranted higher pay than he was receiving. There is no
23  evidence as to who that decision-maker would have been in any
24  event. Without any identifiable adverse employment decision or
    action taken against Plaintiff, he cannot establish an intentional
25  discrimination or retaliation claim.  To the extent Plaintiff
    attempts to assert a discrimination or retaliation claim based on
26  being denied a project manager position or its associated pay,
    apart from the denial that occurred with respect to the 2006
27  Project Manager position, summary judgment on such claims is
    GRANTED.

28

applicant who was ultimately selected or even as qualified as the top seven applicants. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact."); *Coleman*, 232 F.3d at 1285 (same); *see also Nichols v. S. Ill. University-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007) (concluding that the "subjective beliefs" of African-American plaintiffs "that they were as qualified or even more qualified" for a position upgrade than the non-African-Americans the employer selected did not create a genuine dispute as to this issue, and thus the plaintiffs failed to create a prima facie case of race discrimination).[6]

That a non-African-American was ultimately selected for the position and thus treated more favorably than Plaintiff is not, by itself, suggestive of discrimination absent some evidence that Plaintiff and the person selected were similarly situated in material respects. *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (recognizing, in a Title VII case, that for the fourth element of the prima facie case, "the individuals seeking relief must demonstrate, at the least, that they are similarly situated to

---

[6] **The fact that Plaintiff possessed, at one point in the past, a City-issued business card with the title "project manager" on it does not show that Plaintiff was as qualified as the candidate ultimately selected for the Project Manager position at issue (or those in the top seven). Montgomery explains in his declaration, which Plaintiff does not refute, that, for a period of time, the Water Division permitted a number of individuals (including Montgomery) to carry business cards that said "project manager" in lieu of more nuanced titles, but this practice was discontinued. (Montgomery Decl. ¶ 9.)**

those employees [allegedly receiving more favorable treatment] in all material respects."); *Leong*, 347 F.3d at 1124 (upholding grant of summary judgment where employee failed to show that similarly situated employees were treated more favorably).  Here, Plaintiff has not demonstrated, nor even made any attempt to show, that he was similarly situated in material respects to the candidate selected or those in the top seven.

Finally, there is no evidence whatsoever that Fey's isolated, tasteless "Schwarzenigger" comment was directed at Plaintiff, close in time to the adverse employment decision or made while Fey was considering Plaintiff for the position.  At his deposition, Plaintiff testified as follows regarding the comment:

> A. And basically, one day he [Fey] was walking and he said something like Arnold – and he was talking to somebody again and instead of saying Arnold's name correctly, he said 'Schwarzenigger.' And I said, What did you say? He came back and said, What did you mean, man? I said, What did you say? How did you say it? So he knows that I don't appreciate or wanted to be involved in any conversations of that sort.
>
> Q. When did that conversation take place?
>
> A. That is going to be – I know it was before he left.
>
> Q. Who was he talking to?
>
> A. He was just in passing and talking to somebody that was in the room. We were in cubicle scenario and I was sitting down.
>
> Q. As you sit here today, do you have any understanding that he had retaliatory animus against you?
>
> A. I don't know.
>
> Q. Did you and David Fey get along okay when you worked together.
>
> A. I think we got along and we were cordial.

(Pl. Dep. 84:2-25.)  This random comment from Fey, not directed at Plaintiff, made at some unknown point in time, with no apparent or evident connection to the adverse employment decision, is a stray remark that does not give rise to an inference that racial animus negatively impacted Fey's rating of Plaintiff for the Project Manager position. *See Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438-39 (9th Cir. 1990) (recognizing that "stray" remarks are insufficient to raise an inference of discrimination and concluding that a comment by the decision-maker that he selected a candidate for a promotion because the candidate was a "bright, intelligent, knowledgeable young man" was a stray remark that did not raise an inference of age discrimination); *Peters v. Shamrock Foods Co.*, 262 F. App'x 30, 32 (9th Cir. 2007) (concluding that a "mom" comment was a stray remark, stating "a single comment related to a separate employment action made two years prior to [the plaintiff's] nonselection for the Food Service Sales Manager position is not direct evidence of [gender] discrimination."); *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir. 1993) (concluding that a superior's comment, not tied directly to the adverse employment decision, that "[w]e don't necessarily like grey hair" did not support an inference of age discrimination).  There is no indication that Fey's comment was spoken with a tone of hostility, and Plaintiff admitted that he and Fey got along and were cordial when Fey worked in the Water Division.  Plaintiff has not provided any rating scores by the three panel members (including Fey) and thus there is no evidence that Fey actually rated Plaintiff lower than the other panel members.  Similarly, Plaintiff has not

provided any evidence that Fey rated Plaintiff lower than other candidates.

Even assuming, *arguendo*, Plaintiff's evidence could create an inference of racial discrimination, the City has advanced a legitimate justification for the decision. After three panel members evaluated a pool of applicants based on certain criteria, Plaintiff ranked 14th on the list, and only the top seven candidates were eligible for selection. Plaintiff does not dispute that he did not make the cutoff. Plaintiff's evidence does not adequately demonstrate that the articulated reason he was not selected – because he ranked 14th on the list, and only the top seven are considered – is pretextual. There is no evidence that, based on evaluation criteria, Plaintiff should have ranked in the top seven. Even if Plaintiff's ranking was mistaken in his eyes, an unwise decision is not an unlawfully discriminatory decision and does not demonstrate pretext. The isolated comment from Fey – one member of a three member outside selection panel – does not alter the equation. Fey's single comment is insufficient to demonstrate pretext or otherwise create a genuine dispute as to the alleged illegal motive behind the adverse decision. *See Coleman,* 232 F.3d at 1285 (concluding that although a plaintiff, Jeney, proffered "sufficient evidence to raise a question of fact as to whether one member of Quaker's management used the words 'young and promotable,'" when discussing what type of employee the company was looking for, "this is not sufficient to raise a question of fact as to whether the reasons Quaker gave for laying Jeney off were pretexts for age discrimination"); *Henderson*, 940 F.2d at 473-74 &

1    n.16 (concluding that a single comment – "[w]ho's going to bank
2    with you downtown? After all, you're a minority bank" – made by a
3    decision-maker who refused to permit an African-American CEO of a
4    minority-owned bank to open a branch office in downtown Seattle was
5    insufficient to create a genuine dispute as to whether the refusal
6    was racially motivated).

7         In the face of the City's legitimate justification, Plaintiff
8    has not demonstrated pretext or otherwise created a triable issue
9    that he was denied the Project Manager position because of his
10   race.  Summary judgment in favor of the City on this claim is
11   GRANTED.[7]

12                   c.    Safety Boots And Transfer

13        Among other things, the City argues that: (1) Montgomery's act
14   of  denying  Plaintiff  safety  boots  (which  was  trumped  by
15   Montgomery's superior) was not an adverse employment action and was
16   justified in any event; and (2) the transfer of Plaintiff within
17   the  Water  Division  to  Gaddy's  supervision  was  not  an  adverse

18   _____

19        [7] In its moving papers, the City also argued that Plaintiff is
20   attempting to assert an intentional discrimination and retaliation
     claim based on the premise that he was not selected for a separate
21   "Supervising Engineering Technician" position because of his race
     (a claim distinct from his reclassification denial claim, which
22   deals with the "Senior Engineering Technician" classification). In
     opposition, Plaintiff does not mention this claim. In any event, it
23   is undisputed that Plaintiff did not apply for this particular
     Supervising Engineering Technician position. (Doc. 38-6 at 10.)
24   Because Plaintiff never applied for the position and no adverse
     employment decision was made, no disparate treatment or retaliation
25   claim exists.   To the extent Plaintiff asserts that he did not
     receive this Supervising Engineering Technician position (which he
26   never applied for) because of his race or due to retaliation,
27   summary judgment on this claim is GRANTED.

28                              35

employment action and was justified in any event. In his opposition brief, Plaintiff does not contend that these events – the denial of safety boots and his transfer – are adverse employment actions that give rise to a claim for disparate treatment. Instead, Plaintiff classifies these events under the heading "Defendant's Additional Harassing Conduct" and argues that they bolster his racial *harassment* claim. Nevertheless, the propriety of granting summary judgment on these potentially lingering disparate treatment claims must be analyzed.

For purposes of a Title VII disparate treatment claim, an "adverse employment action is one that materially affect[s] the compensation, terms, conditions, or privileges . . . of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). While Montgomery approved of the slip-on, steel-toe boots for Plaintiff, Montgomery denied Plaintiff's request for safety boots. Thereafter, however, Plaintiff secured approval for the safety boots from Montgomery's superior. (Doc. 39-3 at 7.) It is difficult to see how Montgomery's transitory denial of safety boots "materially" affected any of the terms, conditions, or privileges of Plaintiff's employment.

Even assuming, however, that Montgomery's temporary denial of safety boots amounts to an adverse employment action and that Montgomery's one-time authorization of safety boots, at some point, for "Buster" (an Hispanic or Latino temp who worked in the field)[8]

---

[8] According to Plaintiff, Buster was not performing similar work (well abandonments); rather, Buster was doing "field verification work." (Pl. Dep. 125:11.) Buster initially used his

36

is sufficient to create a prima facie case of racial discrimination, the City has advanced a legitimate justification for Montgomery's action.

Plaintiff admits that Montgomery requested that Plaintiff try the slip-on, steel-toe boots instead of the work boots Plaintiff requested. (Doc. 38-6 at 11; Doc. 38-5 at 3.)  Montgomery, along with other supervisors, went through training from the Chief of Operations in which supervisors were advised of the utility of slip-on, steel-toe boots for those individuals who worked out in the field on an intermittent basis. (Montgomery Decl. ¶ 12.)  In 2005 (which is when the boot denial occurred), Montgomery and the employees in his section who worked in the field on an intermittent basis were not provided steel-toe work boots. (*Id.*) In 2005, Plaintiff's job duties were altered such that the he would be spending more time in the field on a periodic basis to perform well abandonments.  After Plaintiff's duties were altered, and in response to Plaintiff's request for safety boots, Montgomery requested that Plaintiff go to the warehouse and try the slip-on, steel-toe boots.  As Plaintiff testified:

Q. What did you say in response?

A. I told him that in my professional opinion, these are not acceptable out in the field. And he told me In your professional opinion, you haven't even tried them.

(Pl. Dep. 132:21-25.) Afterwards, Plaintiff went and tried on the

own safety boots (that he himself provided), but they eventually wore out. (Pl. Dep. 123:16:17.) Apparently after his own safety boots wore out, Buster was provided, or received authorization for, another pair of safety boots.

slip-on, steel-toe boots, he eventually found a pair that fit, he used them in the field once and slipped, and "took them off and that was it." (Pl. Dep. 132:2-3.) Then, Plaintiff, unknown to Montgomery, obtained approval for safety boots from Montgomery's superior, Lon Martin, and this came to light in the parking lot discussion between Plaintiff, Montgomery, and Martin.

During the parking lot discussion, Plaintiff testified that he tried to explain "what was going on with the safety boot issue. And basically, I asked him [Montgomery] Why can't you just give me safety boots? . . . And he said, Well, you haven't even tried the slip-ons. And at that time, Mr. Martin, Lon Martin was pulling up in his vehicle. And I said, Why can't you give me safety boots? This guy here has already given me safety boots." (Pl. Dep. 135:23-136:1; 136:4-9.) After the parking lot discussion, Plaintiff obtained the boots he requested. (Pl. Dep. 133:23.)

The fact that steel-toe work boots were not provided to Montgomery and the employees in his section who worked in the field on an intermittent basis, that Montgomery was specifically trained on the utility of slip-on, steel-toe boots in these types of situations, and that he believed Plaintiff had not given the slip-ons an adequate try, provides a legitimate, nondiscriminatory justification for Montgomery's refusal to authorize the work boots. In response, Plaintiff has not demonstrated that the City's legitimate justification is pretextual. The fact that third-party contractors actually required Plaintiff to wear safety boots while on-site does not demonstrate pretext. There is no evidence that Montgomery was aware of this fact and refused to authorize the

safety boots notwithstanding.  Even if the slip-on boots were not the best possible shoe for the occasion, and even if it was unwise for Montgomery to deny the work boot authorization and insist that Plaintiff give the slip-on boots an adequate try, this does not demonstrate pretext as Montgomery had been encouraged to have employees try the slip-on, steel-toe boots.

In the face of the City's legitimate justification, Plaintiff has not demonstrated pretext or otherwise created a triable issue that he was temporarily denied safety boots because of his race. Summary judgment on this disparate treatment claim is GRANTED.

With respect to the transfer from Montgomery's supervision to Gaddy's supervision in the Telemetry section, Plaintiff argues that Montgomery wanted him transferred when "Montgomery discovered that Plaintiff had acquired the authorization for the boots." (Doc. 38-5 at 17.)  However, Montgomery's displeasure with how Plaintiff handled the boot situation provides a legitimate, nondiscriminatory justification for Montgomery's transfer request.

Plaintiff himself recognized that, by getting approval elsewhere, "I felt that he's [Montgomery's] really going to think that I went behind his back." (Pl. Dep. 128:16-17.) In the parking lot discussion, after Plaintiff informed Montgomery that Martin approved of the safety boots, Plaintiff "waived Lon [Martin] over so that hopefully it would quash the incident and it made it worse. Because now, Neil [Montgomery] thinks I went behind his back totally and everything comes out. And Neil says, I want him out of here." (Pl. Dep. 136:22-137:2.)

It is undisputed that, during the parking lot discussion, when

Montgomery's failure to issue the safety boot authorization came up, he became visibly angry. (Doc. 39-3 at 7.) In his declaration, Montgomery acknowledges that, during the discussion, when he learned that "Plaintiff had already received approval for the steel-toe boots" Montgomery "became increasingly frustrated" and "indicated to Mr. Martin that he needed to move Plaintiff" out of his section. (Montgomery Decl. ¶ 7.)

Both Plaintiff's briefing and his testimony, consistent with Montgomery's declaration, indicate that what precipitated Montgomery's parking lot communication to Martin, that he wanted Plaintiff out of his section, was the revelation that after requesting the safety boots from Montgomery, Plaintiff had obtained approval elsewhere for the safety boots without Montgomery's knowledge. Montgomery's displeasure with how Plaintiff handled the boot situation, by going above or around Montgomery without Montgomery's knowledge and bringing this to his attention in the parking lot discussion, provides a legitimate nondiscriminatory reason for his request to Martin to move Plaintiff out of Montgomery's section. *See Slatkin v. Univ. of Redlands*, 88 Cal. App. 4th 1147, 1157 (2001) (recognizing that even a "personal grudge can constitute a legitimate, nondiscriminatory reason for an adverse employment decision") (internal quotation marks omitted).

Martin, who later made the decision to move Plaintiff to Gaddy's supervision, believed he was confronted with a situation where Plaintiff "was having ongoing disputes with his supervisor."[9]

---

[9] In Plaintiff's opposition briefing, Plaintiff also represents that he had several "problems" with Montgomery (Doc. 38-

Martin, however, wanted Plaintiff to continue performing well abandonments. He decided "it would be best to move Plaintiff under Mr. Gaddy's supervision" as he believed "Mr. Gaddy's personality would be a better fit as a supervisor." (Martin ¶¶ 5, 7.) This is a legitimate, nondiscriminatory reason for the transfer. It is undisputed that since being transferred to Gaddy's supervision, Plaintiff has had no problems with Gaddy's supervision and has not been the subject of any negative reviews or disciplinary conduct. (Doc. 38-6 at 24.)

In the face of a legitimate, nondiscriminatory reason for Montgomery's request to Martin to move Plaintiff out of his section, and Martin's legitimate, nondiscriminatory reason for doing so, Plaintiff has not demonstrated pretext or otherwise created a triable issue that his transfer was motivated by his race. (Again, Plaintiff does not even dedicate any briefing to this claim or these issues.) Even assuming that Plaintiff has somehow created a prima facie case of discrimination with respect to the transfer, in light of the legitimate justifications identified, Plaintiff has not created a triable issue. To the extent Plaintiff asserts that he was transferred because of his race, summary judgment on this disparate treatment claim is GRANTED.

C. **Retaliation**

Plaintiff's complaint asserts a retaliation claim under Title VII. "The elements of a prima facie retaliation claim are, (1) the employee engaged in a protected activity, (2) []he suffered an

_____

5 at 17.)

adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Davis,* 520 F.3d at 1093-94. In opposition to the City's motion for summary judgment on this claim, Plaintiff makes no attempt to explain the nature of his retaliation claim or justify its maintenance – Plaintiff does not even mention this claim.

The City identifies four events it believes represents the protected activity in which Plaintiff claims he engaged (and Plaintiff does not challenge the City's characterization of his retaliation claim). These events include: (1) a complaint in 2000 about Peyton's alleged use of the term "slave"; (2) a complaint in 2002 about Little's use of the term "niggardly"; (3) an internal complaint with Patrick Wiemiller/Kay Hartman on or about January 16, 2006, after the transfer to Gaddy's supervision; (3) the DFEH complaint filed on or about August 21, 2006. (Doc. 26 at 18-19.)

With respect to these forms of protected activity,[10] the City argues that any adverse employment decision allegedly connected to this activity that falls outside the statute of limitations period cannot support a retaliation claim, *i.e.*, such claims are time-barred. With respect to any remaining non-time-barred retaliation claims, the City argues that Plaintiff cannot satisfy the requisite elements. From the briefing, it is unclear which adverse employment actions Plaintiff claims are associated with the

---

[10] In framing its arguments, the City does not contend these four events do not constitute protected activity. Accordingly, for purposes of this order, it is assumed, *arguendo*, that these four events represent protected activity.

42

protected activities enumerated above (again, Plaintiff has not submitted any briefing on his retaliation claim in his opposition to the City's motion). In any event, to the same extent Plaintiff's disparate treatment claims are barred by the statute of limitations, Plaintiff's retaliation claims, based on the same adverse employment actions, are equally barred. With respect to any remaining retaliation claims (discussed below), summary judgment on these claims is warranted.

### 1. Complaint about "slave" comment

In February 2000, after Peyton's "back to work slave" comment uttered in Plaintiff's presence, Plaintiff complained about the comment to Montgomery. Plaintiff testified that he was given the opportunity to provide a statement regarding the incident. (Pl. Dep. 173:21-22.) According to Montgomery (and e-mails attached to his declaration), an investigation was conducted and ultimately Peyton was advised that he should be sensitive about comments made in the presence of coworkers. The alleged adverse employment actions that took place after this complaint include Plaintiff's denial of reclassification to Senior Engineering Technician, the non-selection of Plaintiff for the Project Manager position, Montgomery's denial of work boots and the transfer of Plaintiff to Gaddy's supervision.

The initial denial of reclassification occurred in June 2003, and it was affirmed December 8, 2003, and on May 4, 2004. The non-selection of Plaintiff for the Project Manger position occurred in 2006. Montgomery's work boot denial and the transfer of Plaintiff to Gaddy's supervision occurred in 2005. The over three-year

temporal gap between the alleged protected activity (the complaint about the "slave" comment in February 2000) and the alleged adverse employment decisions is too wide to support an inference of causation. Moreover, there are legitimate justifications for each of these actions (discussed above), and Plaintiff has not demonstrated pretext or otherwise created a triable issue as to whether these decisions were taken in retaliation for the protected activity. Furthermore, the employer counseled Peyton about racial insensitivity.

To the extent Plaintiff asserts a claim for retaliation based on alleged adverse employment actions taken in retaliation for the "slave" comment complaint, summary judgment on this claim is GRANTED.

### 2. Complaint about "niggardly" comment

Before he left the City's employ in 2002, Little had the "niggardly" conversation with Plaintiff, and Plaintiff complained to, or talked about it with, Martin, Nora Laikam and/or Montgomery. (Pl. Dep. 50:11-12; 194:7-8.) Plaintiff estimates the conversation with Little occurred in the 2001 to late 2002 time-frame. (Doc. 38-5 at 14; Pl. Dep. 192:5-8.) The alleged adverse employment actions that took place after this complaint include Plaintiff's denial of reclassification to Senior Engineering Technician, the non-selection of Plaintiff for the Project Manager position, Montgomery's denial of work boots and the transfer of Plaintiff to Gaddy's supervision.

The temporal gap, consisting of multiple years, between the "niggardly" conversation with Little and Plaintiff's complaint and

the non-selection of Plaintiff for the Project Manager position (2006) is too wide to support an inference of causation between the two. The same can be said with respect to the denial of safety boots and transfer to Gaddy's supervision (2005). Moreover, the City has advanced legitimate justifications for these decisions, and Plaintiff has not demonstrated pretext or otherwise created a triable issue as to whether these decisions were taken in retaliation for the protected activity.

With respect to the initial denial of reclassification in June 2003 this happened a little closer in time than the other adverse employment actions. However, Plaintiff testified that he was unaware of any personalized racial animus on the part of Chavez, and Plaintiff has not pointed to any evidence which would suggest that Chavez was even aware of his complaint over the Little "niggardly" conversation. The City has advanced a legitimate justification for its decision to deny Plaintiff's reclassification in any event, and Plaintiff has not demonstrated pretext or otherwise created a triable issue that the denial of his reclassification occurred due to retaliation.

To the extent Plaintiff is asserting a claim for retaliation based on alleged adverse employment actions taken in retaliation for the "niggardly" comment complaint, summary judgment on this claim is GRANTED.

3.   <u>Internal complaint with Patrick Wiemiller/Kay Hartman</u>

According to Plaintiff's DFEH Complaint, in or about January 2006, after he was transferred to Gaddy's supervision, he filed a complaint with Kay Hartman, Human Resources Specialist, about race

**45**

discrimination.[11]   The only viable adverse employment decision occurring after this complaint in January 2006 is the non-selection of Plaintiff for the Project Manager position, which occurred sometime after the City posted the opening for the Project Manager position in February 2006.   While the timing is somewhat close, Plaintiff has not proffered any evidence indicating that, at the time they were rating Plaintiff, the three panel members, including Fey, had any knowledge of Plaintiff's complaint of race discrimination to Hartman.   Fey's "Schwarzenigger" comment, although unpleasant, does not raise suspicions of retaliatory motives.   Plaintiff testified at his deposition that he did not know whether Fey had any retaliatory animus, and that he and Fey got along and were cordial. (Pl. Dep. 84:18-25.)

Even assuming Plaintiff has advanced sufficient evidence to create a prima facie case of retaliation, the City has advanced a legitimate, nonretaliatory reason for the decision not to select Plaintiff for the Project Manager position.   Out of a pool of applicants, Plaintiff ranked 14th and only the top seven were eligible for selection.   In the face of this legitimate, nonretaliatory reason Plaintiff has not demonstrated pretext or

---

[11] The City attaches Plaintiff's DFEH complaint as an exhibit to a motion for judicial notice. (Doc. 35.)   The City filed its motion for judicial notice in conjunction with its motion for summary judgment or, in the alternative, partial summary judgment/summary adjudication.   The City requests judicial notice of the DFEH complaint, prior pleadings in this case, and sections of the Fresno Municipal Code.   The existence of these items is a matter of public record and can be judicially noticed. The City's motion for judicial notice is GRANTED.

otherwise created a triable issue that he was not selected for the Project Manager position due to retaliation for the Hartman complaint.

To the extent Plaintiff is asserting a claim for retaliation based on alleged adverse employment action taken in retaliation for his complaint to Hartman, summary judgment on this claim is GRANTED.

**4.   DFEH complaint on or about August 21, 2006**

Plaintiff filed a complaint with the DFEH on or about August 21, 2006. The DFEH complaint was filed after any of the alleged adverse employment actions took place. Accordingly, this protected activity could not have caused earlier adverse employment actions. To the extent Plaintiff is asserting a claim for retaliation based on alleged adverse employment actions taken in retaliation for his DFEH complaint, summary judgment on this claim is GRANTED.

**D.   § 1981**

As indicated in his opposition brief, Plaintiff is pursuing a § 1981 claim on the theory that he was subject to discrimination and harassment based on his race.

"Title VII prohibits employers from discriminating against an individual based on race. Similarly, § 1981 prohibits discrimination in the benefits, privileges, terms and conditions of employment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (internal citation and quotation marks omitted). Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

> evidence, and to the full and equal benefit of all laws
> and proceedings for the security of persons and property
> as is enjoyed by white citizens, and shall be subject to
> like punishment, pains, penalties, taxes, licenses, and
> exactions of every kind, and to no other.

Section 1981(b) provides

> For purposes of this section, the term 'make and enforce
> contracts' includes the making, performance,
> modification, and termination of contracts, and the
> enjoyment of all benefits, privileges, terms, and
> conditions of the contractual relationship.

In the Ninth Circuit, a plaintiff can base a § 1981 claim on racial discrimination or racial harassment cognizable under Title VII. *See Surrell,* 518 F.3d at 1103 ("When analyzing § 1981 claims, we apply the same legal principles as those applicable in a Title VII disparate treatment case") (internal quotation marks omitted); *Johnson v. Riverside Healthcare Sys.*, *LP*, 534 F.3d 1116, 1122 & n.3 (9th Cir. 2008) (stating that, "[i]n this circuit," hostile work environment racial harassment claims "are cognizable under § 1981" and that "[h]ostile work environment claims under Title VII contain the same elements of a § 1981 hostile work environment claim and, thus, the legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action.") (internal quotation marks omitted).

The City contends that seven other Circuit courts have concluded that § 1981 does not provide an independent cause of action. The City argues that this court should reconsider the Ninth Circuit's decision in *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996), which, unlike other courts, held that § 1981 does provide an

48

independent cause of action against municipalities. A panel of the Ninth Circuit recently reviewed the *Federation* decision and the panel did not "believe that *Federation* can or must be overruled." *Pittman v. Oregon, Employment Dep't*, 509 F.3d 1065, 1073 (9th Cir. 2007).[12]  A district court in California must follow Ninth Circuit precedent, which has not been overruled.

The City also argues that, just like with § 1983 *Monell* claims, to establish his § 1981 claim, Plaintiff must show that a policy or custom of the City caused the alleged discrimination/harassment.   This argument has merit.  *See Federation*, 96 F.3d at 1214-15 (concluding that a claim under § 1981 against a municipality requires the same *Monell* evidence as a § 1983 claim). In *Pittman* the Ninth Circuit stated:

> Notably, the argument that § 1981 contains a cause of action against municipalities was raised in *Federation* in an attempt to free plaintiffs from the obligation to demonstrate a 'policy or custom' as required under *Monell* to impose liability on local government units under § 1983. *Federation* ultimately held on the latter question that the 'policy or custom' requirement pertains to municipalities sued under § 1981.

509 F.3d at 1070 (internal citation omitted). Under *Monell* and its progeny, "[l]iability may attach to a municipality only where the municipality itself causes the [civil rights] violation through execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Ulrich v. City & County of San*

---

[12]  *Pittman* did, however, decline to extend the holding in *Federation* (*i.e.*, that § 1981 provides a cause of action against municipalities) to arms of the state. 509 F.3d at 1070.

*Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (internal quotation marks omitted).

The City argues that Plaintiff lacks *Monell* evidence and, therefore, Plaintiff's § 1981 claim fails. The City argues that Plaintiff cannot point to any policy or custom of the City which caused the alleged racial discrimination/harassment in this case. The City notes, and it is undisputed, that the City has a policy against harassment and the City holds periodic training on this policy. (Doc. 38-6 at 13.) The evidence also shows that the City has a policy against discrimination (it appears in the same document as the anti-harassment policy). (Chavez Decl. Ex. L.)

In opposition to the City's motion, Plaintiff does not argue or submit evidence showing that the City has the requisite policy or custom to be held liable under § 1981. In fact, Plaintiff does not address the issue at all in his briefing. Plaintiff also failed to plead any such policy or custom in the complaint. Plaintiff's failure to adduce *Monell* evidence is fatal. *Cf*. *Lakteen v. Clark County*, 255 F. App'x 273, 274-75 (9th Cir. 2007) ("The district court properly granted summary judgment to the County on Lakteen's section 1983 claim, because she did not present evidence sufficient to show either that the alleged sexual harassment was the result of the County's official policy or custom, or that a final policymaker of the County was involved in the alleged misconduct.").

Plaintiff has failed to create a genuine issue of fact as to whether the alleged racial discrimination/harassment was caused by a policy or custom of the City within the meaning of *Monell* and its

progeny.  Summary judgment on Plaintiff's § 1981 claim is GRANTED.[13]

E.    **FEHA**

1.    **Race Discrimination**

The same analyses and conclusions as set forth above with respect to Plaintiff's Title VII racial discrimination claim apply to his race discrimination claim under the FEHA, with some minor variations.

Under the FEHA, a DFEH complaint must be filed within one year after the violation occurred. *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 492 (1992).  Given the date Plaintiff filed his DFEH complaint (August 21, 2006), any adverse employment action that took place before August 21, 2005, cannot support an independent FEHA race discrimination claim.  Accordingly, Plaintiff cannot maintain a FEHA race discrimination claim on the basis that Montgomery's sick leave admonishment, which occurred at some point prior to January  2, 2005, and Montgomery's refusal, in April/May 2005, to allow Plaintiff to change a training class, constitute independent actionable adverse employment actions under the FEHA. The City's motion for summary adjudication that those claims are barred by the statute of limitations is GRANTED.

As for the reclassification denial, the decision not to select

_____

[13] **Because summary judgment is warranted on Plaintiff's race discrimination claim under Title VII, racial discrimination cannot form the substance of Plaintiff's § 1981 claim. In other words, to the extent Plaintiff's § 1981 claim is based on racial discrimination (which was the only basis referenced in the pleadings), that Plaintiff's Title VII racial discrimination claim fails to survive summary judgment provides an independent basis on which to grant summary judgment on Plaintiff's § 1981 claim.**

Plaintiff for the Project Manager position, Montgomery's denial of safety boots and the transfer of Plaintiff to Gaddy's supervision, for the same reasons discussed above, Plaintiff has failed to create a triable issue that those decisions were unlawfully motivated by his race.  The City's motion for summary judgment on those claims is GRANTED.

### 2.    Racial Harassment

The FEHA prohibits harassment on the basis of race. *Dee v. Vintage Petroleum, Inc.*, 106 Cal. App. 4th 30, 35 (2003).  In analyzing such claims,  "[c]alifornia courts have been guided in their interpretations of FEHA by the federal court decisions interpreting Title VII." *Id.* (internal quotation marks omitted).

To prevail on a hostile workplace claim premised on race, "a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.*" Vasquez*, 349 F.3d at 642 (Title VII case) (footnote omitted); *see also Dee*, 106 Cal. App. 4th at 35.

To determine whether conduct was sufficiently severe or pervasive, a court examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez*, 349 F.3d at 642.

In order to satisfy the third element of this test, [the

> plaintiff] must show that h[is] work environment was both
> subjectively and objectively hostile. In making the
> objective determination, we look to all of the
> circumstances, including the frequency, severity, and
> nature (*i.e.*, physically threatening or humiliating as
> opposed to merely verbally offensive) of the conduct. The
> required severity of the conduct varies inversely with
> its pervasiveness and frequency. Finally, the objective
> hostility of the environment must be considered from the
> perspective of a reasonable person belonging to the
> racial or ethnic group of the plaintiff.

*Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005) (internal citations and quotation marks omitted). "Harassment includes epithets, derogatory comments or slurs . . . ." *Dee*, 106 Cal. App. 4th at 35 (internal quotation marks omitted).

The City makes three arguments as to Plaintiff's hostile work environment claim: (1) it cannot be based on conduct that took place before August 21, 2005, as such conduct is time-barred as outside the statute of limitations; (2) the conduct within the statute of limitations period is not sufficiently severe or pervasive to create a viable racial harassment claim; (3) even when considering all the alleged conduct (whether time-barred or timely), it does not give rise to a viable hostile work environment claim because it is not sufficiently severe or pervasive.

In opposition, Plaintiff argues that a hostile work environment existed and continued into the limitations period and, by virtue of the continuing violation doctrine, Plaintiff can use conduct outside the limitations period to support his racial harassment claim. Second, Plaintiff argues that when all the conduct is considered, a triable issue remains as to whether the conduct was sufficiently severe or pervasive.

If the alleged conduct at issue, including conduct occurring

within and outside the limitations period, creates a triable issue as to whether it was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment, it must be separately determined whether the continuing violation doctrine can be invoked.

### a. Severe Or Pervasive

There is no evidence or argument in this case that Plaintiff was subject to physical acts of violence. Plaintiff's hostile work environment claim is based on verbal comments and non-violent actions taken by employees of the City. While the parties were able to ascribe a date or time-frame to some comments, the date or time-frame as to others are not provided and do not appear in the record.

The earliest identified comment is the "white power" comment uttered by Peyton in the mid 1990's. It is undisputed that Peyton reviewed some of Plaintiff's work. According to Montgomery (Plaintiff's supervisor), Peyton was a professional engineer who "indirectly" had supervisory authority over Plaintiff. (Montgomery Dep. 45:14.) The "white power" comment arose during a conversation between McIntyre and Peyton about a fight that broke out at the school where McIntyre's wife worked. Apparently, she attempted to break up the fight. As McIntyre relayed the story, Plaintiff overheard Peyton say to McIntyre, "Hey man, I got your back; white power, brother." Plaintiff was turned away from Peyton when Peyton uttered this comment. (Pl. Dep. 166:22.)

Sometime in the 90's or 2000 (Pl. Dep. 198:25), Plaintiff walked up to a conversation between Peyton and Montgomery in which

they were discussing movies. Peyton said "something about Arnold 'Schwarzenigger'" and Plaintiff said "What did you say." (Pl. Dep. 62:20-21.) Peyton "got quiet and that was it." (Pl. Dep. 62:21-22.)

Sometime in 2000, Peyton uttered "okay, back to work slave."[14] Plaintiff was having a conversation with two coworkers, Donna (African-American) and Rick (Caucasian). (Pl. Dep. 169:15; 169:20). They were discussing some information that Donna had requested from Rick, a temporary engineering technician. Just after the conversation concluded, Peyton looked at Plaintiff and said "Okay, back to work slave." (Pl. Dep. 171:9.) The City disputes that Peyton was referring to or looking at Plaintiff when Peyton made this comment; the City contends the comment was stated to Rick. However, on summary judgment, the evidence of the non-movant is to be believed. Plaintiff testified at his deposition that he believed Peyton was referring to him when he made the "okay, back to work slave" comment because "he [Peyton] was looking at me." (Pl. Dep. 171:9.) This version of the event must be believed for purposes of summary judgment.

Plaintiff reported Peyton's comment to Plaintiff's supervisor, Montgomery, in an e-mail dated February 2, 2000. (Pl. Dep. Ex. 18.) In that e-mail to Montgomery, Plaintiff explained that, after the conversation with his coworkers concluded, Rick and Donna were walking away. Denis then "blurted out This ok back to work slave.

---

[14] Plaintiff's briefing states that this comment occurred [s]ometime in the year 2000." (Doc. 38-5 at 5.) In his deposition, Plaintiff acknowledged that he drafted a synopsis of this incident on February 2, 2000. (Pl. Dep. 168:18-24, Ex. 18.)

I asked him what did he mean. He stated that Rick was the slave/indentured slave becasue (sic) he is paid. This is out of line. What type of action we (sic) be taken." (*Id.*) Later that day, Montgomery wrote back to Plaintiff: "What do you think is appropriate action? I don't think Rick was offended, since I later heard him joke about being our slave." (*Id.*) Plaintiff wrote back that he wanted clarification on what was meant by the statement and why Peyton believed it was appropriate to utter this statement in the presence of two African-Americans. (*Id.*) Plaintiff concluded the e-mail stating "please investigate." (*Id.*) According to Plaintiff, when he informed Montgomery of the comment, Montgomery "told me to find Mr. Peyton, a Caucasian man, and ask him what he meant by the comment." (Pl. Decl. ¶ 24.) The matter was investigated and witness statements were taken. Plaintiff testified that he was given the opportunity to provide a statement. Documentary evidence in the record shows that, after the investigation, it was determined by the City that the "slave" comment was made in a joking manner, and Peyton was advised that he should be sensitive about comments made in the presence of coworkers.[15] It does not appear any further punishment was administered.

About a year later, on or about January 17, 2001, Peyton was in a work meeting with another supervisor, Lonzy Armstrong (African-American) and Lupe Ramos. (Pl. Dep. 175:16-176:7-8; Pl. Dep. Ex. 20; Hartman Decl. ¶ 5.) Plaintiff appeared while the

_____

[15] **Obviously to Plaintiff, this was not a joke.**

meeting was in progress. (Pl. Dep. Ex. 20.) Upon concluding the meeting, as he was leaving, Peyton greeted Armstrong, looked at Lupe to his right and said nothing, and walked past Plaintiff on his left. (*Id.*) Plaintiff moved out of the way to give Peyton more room to leave. On Peyton's way out, and with his back toward Lupe, Peyton, according to Plaintiff, uttered the words "black man." (Pl. Dep. 175:11-15, Ex. 20) Plaintiff asked Peyton what he said, and Peyton replied with "nothing." (Pl. Dep. 176:10, Ex. 20.)

Montgomery indicated to Plaintiff that he (Montgomery) wanted Plaintiff to put the encounter in memo form. (Pl. Dep. 176:19-21.) Plaintiff sent an e-mail to Montgomery and drafted a letter purporting to memorialize the incident. (Pl. Dep. Exs. 20-21) Plaintiff testified that the "black man" utterance was a "mumble" and "inaudible." (Pl. Dep. 177:24-178:1.) The matter was investigated (Montgomery Decl. ¶ 3), and the City (not Plaintiff) concluded that "it is unknown if the words were spoken or not" (Montgomery Decl. Ex. B). For purposes of summary judgment, Plaintiff's version of the event – that Montgomery did utter those words – must be believed. Peyton left the City's employ in 2002.

At some point in time between the late 1990's and 2002, Robert Little, a Water Supervisor I, had a conversation with Plaintiff in which Little stated "there are niggers and there are blacks." Plaintiff acknowledges that this statement was not made in reference to him, but to an African-American worker named Greg. Plaintiff indicated in his deposition that the conversation occurred after Little brought it to Plaintiff's attention that Greg could not read a tape measure. Plaintiff recounted the

conversation as follows:

A.  The first incident would be his statement that there are niggers and there are blacks.  It was in response to my explaining to him after he brought it to my attention that an individual by the name of Greg could not read a tape measure.  And I asked him What do you mean? Why are you saying this? He said, Come with me.  I said, Hey, man, if we're going to go out, I don't want to hear anything.  And he said, No, I got to tell you something.  I'll be straight with you.  I said, Okay, I'm telling you don't say nothing because I've been in that situation before where people believe that they can say things or do things because they want.

And then he said, I just want you to know, Robert, there are two different types of people for each race.  I said, Man, I don't need to hear this.  He said, Well, there are niggers and then there are blacks.  I said, Man, don't use that in my presence again.  Don't ever bring that up in my presence.  And he said, Well, I'm just telling you how I am.  I said, Well, I'm just telling you how I am.

Q.  Who is Greg?

A. Greg was an African American, field guy, that worked in the field as a laborer, I think, or something like that.
. . . .

Q.  And you indicated that Mr. Little was critical of his not being able to read a tape measure?

A.  That's what he said.

Q.  And then all of a sudden, he indicates to you – or discusses there are two types of people in each race?

A.  Yeah.

Q.  And did he discuss another race besides blacks? Did he discuss Asians or Hispanics or anything else?

A. He said spics and Spanish, Hispanics. I think he is half Puerto Rican, I think.  And of course, he went to the Asians.

Q.  Asians and?

A.  And gooks.

Q.  Did  he  describe  any  other  race  during  that

conversation.

A. I can't remember at this time.

Q. That's when you basically shut him down.

A. Yeah. Just done.

(Pl. Dep. 181:23-183:2; 183:6-184:2.) Over a year later (Pl. Dep. 185:3), Little had the "niggardly" conversation with Plaintiff.

According to Plaintiff, the backdrop of the discussion involved "somebody in Washington D.C. [who] was fired for using the term 'niggardly.'" (Pl. Dep. 184: 9-10.) Little informed Plaintiff of a person who used the word "'niggardly' in a public conference." (Pl. Dep. 185:22-23.) There were "public employees inside of a meeting, and the person actually got terminated." (Pl. Dep. 185:24.)[16]

As Plaintiff recounted the conversation, Little said "I got a joke for you" and Plaintiff stated he did not "want to hear your jokes and you know what I'm talking about." (Pl. Dep. 186:6-8.) Little indicated "it's not like that at all" (Pl. Dep. 186:9), Plaintiff agreed to listen, and Little said "[w]hat do you think of a black man getting fired for using the word 'niggardly'? And I asked him, Didn't I just tell you not to go there? Didn't I just tell you not to do that. He said, Well, don't you think it's funny? It's not the same. 'Niggardly' and 'nigger' is not the same." (Pl. Dep. 11-18.) In response, Plaintiff said "I already told you not to."

Plaintiff found the word "niggardly" offensive "because it's

---

[16] **The City does not raise any First Amendment issues in this case.**

so close to 'nigger.'" (Pl. Dep. 188:24-25.)   After that conversation, Plaintiff was sitting at his work table and Little brought over to Plaintiff some "documentation" on the correct use of the word "niggardly." (Pl. Dep. 191:2-3.)   Plaintiff thought Little was trying to get Plaintiff to basically admit "you know, okay, you're right." (Pl. Dep. 191:6.)   The documentation appears to be some sort of news blog or posting on the word "niggardly." (Gavin Decl. Ex. H.) Plaintiff wrote some handwritten notes on this documentation.

At the end of his handwritten notes, Plaintiff wrote "[t]o end our conversation in [his] office I asked him [Little] to find the word or find the meaning of the word." (Pl. Dep. 193:4-6.) A dictionary was brought out of another employee's office, and, according to Plaintiff, the word was "spoken more than 15, 20 times. Niggard, niggardly. Niggardly niggard. It's different." (Pl. Dep. 193:17-20.) Little was saying that, and another employee, Brock Buche, also read the word "niggardly" out loud. (Pl. Dep. 193:23-24.) Plaintiff complained to, or talked about the matter with, Martin, Nora Laikam and/or Montgomery. (Pl. Dep. 50:11-12; 194:7-8.)

On more than one occasion in the 2004 to 2006 time-frame, Dick Short, a water production supervisor, referred to an African-American as a "boy" in Plaintiff's presence. (Pl. Dep. 55:22-56:17.)   Plaintiff does not contend that Short ever referred to him as a "boy." Plaintiff testified that, on one occasion during this time-frame, Plaintiff was talking with Short and Short said "Tiger Woods, that boy can play." (Pl. Dep. 56:1-2.)   On another occasion,

Short said "that's a big boy" when referring to somebody who was an African-American. (Pl. Dep. 55:23; 199:15.)  At one point in his deposition, Plaintiff testified that he made a "shrug and a wince" in response to the "boy comment" (Pl. Dep. 11-12), but he also testified that he verbalized dissatisfaction with the term to Short and Short "knew where I was coming from." (Pl. Dep. 201:3-4.)

At some unspecified point in time, according to Plaintiff, Short was speaking to another employee, Kenny Jennings.  Short put his arms around Jennings and said, "If you can't get your niggers to do this, I'll get mine." (Pl. Dep. 325:1-4.)  The context of this statement is unclear.  Neither party was able to provide a date or time-frame for this statement.[17]

On or about March 12, 2004, Leslie Smith, an executive secretary in the Water Division, wrote the following e-mail to several people.

> Can anyone over there use a slotted box holder thingie (that's the technical term for you engineers!). I have one from Lon's office I need to get rid of. Need a hanging/pull down map holder thingie too? I have one of those as well. Wow, all this technical talk really tires me out! Let me know. Thanks!

Montgomery wrote back to the group:

> We will ask Robert to investigate and respond. He understands technical terms such as 'holder thingie.' Thanks . . .

(Pl. Dep. Ex. 24; Montgomery Decl. ¶ 14.) Plaintiff wrote back to

_____

[17] **Plaintiff *argues* in his briefing that this statement occurred within the statute of limitations period but there is no *evidence* to support this argument. The most that can be inferred from the evidence is that the statement occurred sometime during Plaintiff's and Short's employment.**

Montgomery that he found Montgomery's e-mail "disrespectful, insulting, and humiliating." Plaintiff wrote "I find no humor here at all." (Pl. Dep. Ex. 24.)

Lastly, there is Fey's "Schwarzenigger" comment, which occurred at some point during Plaintiff's employment and prior to Plaintiff's interview for the Project Manager Position in 2006. Instead of saying Arnold Schwarzenegger's name correctly Fey said "Schwarzenigger." Fey made the comment while he was talking to another individual. Plaintiff was sitting down in his cubicle at the time. (Pl. Dep. 84:2-17.)

Besides verbal comments, Plaintiff argues that "additional harassing conduct" occurred which includes the sick-leave incident (which happened sometime before January 2, 2005), the safety boot denial and the transfer to Gaddy's supervision (2005).

Plaintiff's position is that the verbal comments to which he was subject and the additional harassing conduct creates a triable issue that he experienced severe or pervasive racial harassment that altered the conditions of his employment and created an abusive working environment that continued into the limitations period.

Plaintiff relies heavily on *Dee*, a race/national origin harassment case. 106 Cal. App. 4th 30.

There, in October 1998, Andy March became the supervisor of Glenda Dee, the plaintiff, and Paul Strickland became Marsh's supervisor. *Id*. at 33. Strickland required Dee to discuss "very personal matters" with him instead of bringing them to the attention of the personal department. *Id*. He degraded and insulted

her for following his orders, and denied responsibility when other people criticized his orders. *Id*. Strickland also called Dee a "bitch" and "'constantly' used the word 'asshole' in her presence." *Id*. Strickland also told Dee that he was friends with the chairman of the board who would support his termination decisions, and Strickland warned that "if someone caused trouble for him ... he'd drag that person down." *Id.*

In March 1999, Strickland ordered Dee to take a document from Marsh's desk with the instruction "Do not get caught." *Id*. Dee attempted to take the document; however, Marsh walked in while she was in his office. Strickland discovered what happened and scolded her, stating "I told you not to get caught." *Id*.

In April 1999:

> Strickland told Dee that she should 'make up stories' to hide information from Marsh. Dee stated, 'My relationship with Andy is straightforward and honest, and I do not know how to lie to Andy.' Strickland said, 'Did I tell you to lie?' Dee replied, 'Well, you did not tell me to lie. You told me to make up stories. Isn't that the same as telling a lie?' Strickland said, 'Well, what are you, a Filipino?' Dee said, 'Yes, a Filipino.' Strickland said, 'Well, it is your Filipino understanding versus mine.'

*Id.* Dee left work on May 4, 1999, due to Strickland's conduct, and she was diagnosed with post traumatic stress disorder. *Id*. She went on disability leave, but offered to come back to work if the company would limit her contacts with Strickland. *Id*. The company refused and terminated Dee on August 20, 1999. *Id*.

In *Dee*, the court of appeals concluded that Strickland's ethnic slur — "it is your Filipino understanding versus mine" — "combined with other evidence" of his misconduct established a

triable issue of fact on the issue of a hostile work environment based on race/national original. *Id*. at 35.  To the court, a reasonable trier of fact could infer that the racial slur "was not an isolated event because it explained Strickland's motivation for creating an abusive working environment for Dee" in which he "berated her, harassed her, ordered her to lie and blamed her for tasks he ordered her to perform," and called her a "bitch" and used the word "asshole." *Id*. at 36-7.

The *Dee* court focused on acts of harassment, and took a picture of Plaintiff's work environment, over a relatively compact period of time – October 1998 to May 4, 1999.  Strickland's engaged in several acts of misconduct in that period and his blatant ethic slur was interspersed with his misconduct, which imbued it with racial overtones.

Plaintiff suggests that *Dee* stands for the proposition that a single racial epithet by a supervisor can alter the conditions of employment.  *Dee* did not so hold.  In reaching its conclusion that the plaintiff's evidence was sufficient to create a triable issue, the *Dee* court specifically considered conduct by Strickland, apart from the ethnic slur, in the totality of the circumstances.  That being said, *Dee* did recognize that an ethnic slur from an employee's superior is an act of harassment that, when coupled with other evidence, can create a triable issue as to whether the employee endured a hostile work environment.

Although this case lacks Strickland-like misconduct, Plaintiff has much more than one racial slur.  Plaintiff has amassed an array of racially charged comments far exceeding the single comment in

**64**

*Dee*.  Blatantly racial comments such as "white power," "there are blacks and then there are niggers," "black man" and "Schwarzenigger" were a continuing part of Plaintiff's workplace. A reasonable African-American would, like Plaintiff, find them offensive.

The City takes the position that for Plaintiff to have a viable racial harassment claim, "a far greater degree of abuse" both in "terms of frequency and the nature of the offensive communications" must have occurred.

In terms of frequency, "[w]hile a hostile work environment claim may be stronger where it is based upon repeated incidents, the pervasiveness of the conduct that must be shown to prevail on a hostile work environment claim varies inversely with the seriousness of the incidents." *Erdmann v. Tranquility Inc*., 155 F. Supp. 2d 1152, 1161 (N.D. Cal. 2001).  And "[w]ithin the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Rodgers v. Western-Southern Life Ins Co.*, 12 F.3d 668, 674 (7th Cir. 1993); *see also Dee*, 106 Cal. App. 4th at 35-36.

In terms of severity, use of the term "nigger" by Little – both in his comment "there are blacks and then there are niggers" and during his "niggardly" conversation when he said "nigger" is not the same thing as "niggardly" – is exceedingly offensive.  The same goes for Short's use of the term "nigger" in his statement "if

you can't get your niggers to do this, I'll get mine."[18]  "It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). Little was a supervisor at the time he uttered these racially charged words. (Little Decl. ¶ 1.)  According to Plaintiff's unrebutted testimony, Short was a water production supervisor at the time.  The supervisory status of

---

[18] **The City raises several objections to Short's statement, none of which have merit. The City contends that Plaintiff never asserted "in the operative pleading or discovery that he was relying on this alleged statement." (Doc. 39-1 at 13.) In a notice pleading regime, however, Plaintiff's complaint need not list each and every racial utterance that he believed contributed to a hostile work environment. Moreover, the "discovery" which the City's cites is a written discovery response drafted prior to Plaintiff's deposition. The statement from Short came out during Plaintiff's deposition, and this is sufficient to put the City on notice that the statement is in contention. The City also notes that Plaintiff stated in his separate statement that Short was a "co-worker," not a supervisor, but then Plaintiff states that Short was a supervisor in Plaintiff's opposition brief. The City, however, shies away from affirmatively declaring that Short was not a supervisor, and Plaintiff's testimony that Short was a supervisor remains unrebutted. In light of this, the "co-worker" reference in the separate statement is an error unreflective of Plaintiff's testimony. Finally, the City contends "even if Plaintiff provided evidence of the alleged statement, it would lack foundation and is likely hearsay." In his deposition, Plaintiff testified about Short and that this statement from Short occurred and, in his declaration, Plaintiff declared that he heard this statement spoken.  An adequate foundation exists.  In terms of hearsay, Short's statement is relevant regardless of its truth (that Short will, in fact, "get" his "niggers" if Jennings could not get his) to show, at a minimum, the effect it had on the hearer.**

Little and Short, both non-African-Americans, enhances the severity of their racial statements. *Rodgers*, 12 F.3d at 675 ("[A] supervisor's use of [an epithet] impacts the work environment far more severely than use by co-equals."). Also enhancing the severity in one instance was Little's persistence in proving that he was right about the term "niggardly" when Plaintiff had already indicated to him that he did not want to engage in such a conversation.

Equally evocative of racial discrimination is Peyton's use of the word "slave." While looking at Plaintiff, Peyton commanded Plaintiff to get back to work "slave." This statement came from a person, Peyton, who Plaintiff previously heard say to another "I got your back; white power, brother." Considering Peyton's other racial comments, the "slave" comment is no joking matter. Peyton's "white power" comment is also offensive in itself. Peyton used these words while referring to a physical altercation, and he was indicating that he would be willing to "go over there" (the school) and use physical violence if necessary. (Pl. Dep. 166:17-25.) A reasonable African-American in Plaintiff's position would feel intimidated by this racially charged utterance. While not Plaintiff's direct supervisor, Peyton reviewed some of Plaintiff's work and had indirect supervisory authority over him.

Coupled with these racially disparaging statements are less odious, but still offensive, racial utterances. On more than one occasion Short referred to an African-American man as a "boy." Plaintiff testified that he heard Short use the term more than twice (Pl. Dep. 56:16-17), even though Plaintiff could provide only

two concrete examples. Plaintiff testified that he has not heard Short use the term "boy" toward non-African-Americans. (Pl. Dep. 56:18-20.) Plaintiff also testified that a couple of coworkers also called him a "boy," and he corrected them. (Pl. Dep. 200:8-9.) The intentional tweaking of Arnold Schwarzenegger's name to "Schwarzenigger" by Fey and Peyton is blatantly racial. Finally, Peyton called Plaintiff a "black man" at short range in a low mumble. Plaintiff testified "little incidents like this are the ones that made my life a living hell." (Pl. Dep. 176:17-18.)

Given the seriousness of certain statements, the necessary level of repetition is lessened, and Plaintiff's numerous identified instances of harassment cross the threshold required to survive summary judgment. Taken together, all the racially charged statements enumerated above create a triable issue as to whether Plaintiff experienced harassment severe or pervasive enough to alter the conditions of his employment and create an abusive working environment.

As to whether the hostile work environment continued into the limitations period, Short's "boy" comments were made between 2004-2006, and Plaintiff declares that he has been subject to racist and offensive comments "throughout" his employment and they "continue to persist." (Pl. Decl. ¶ 22.) Short's "boy" comments, alongside this statement in Plaintiff's declaration, are sufficient to create a triable issue as to whether the hostile work environment continued into the limitations period. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998) ("Draper's statement during her deposition that Anelli's conduct persisted for

68

most of her term of employment at Coeur is, viewed properly, evidence that supports her allegation that she continued to endure sexual harassment after November 18.").[19]

The cases cited by the City do not require a contrary result. The City cites *McGinest* as an example of what is necessary to create a viable racial harassment claim. But given the egregious facts in *McGinest*, it was not even a close call; rather, it was "clear" that the plaintiff had enough to "survive a motion for summary judgment." *McGinest*, 360 F.3d at 1114. Because *McGinest* was a "clear" case, *McGinest* does not provide a benchmark for the minimum level of facts necessary to survive a summary judgment motion.

A closer case is *Manatt v. Bank of America,* which the City also cites. 339 F.3d 792. There, for a span of two-and-a-half years, the plaintiff, Li Li Manatt, an American citizen of Chinese descent, worked in the trade finance department of the Bank of American's Portland, Oregon, office. *Id.* at 794. During that time, Manatt claimed that statements by others created a hostile work environment. *Id.* at 795.

On one occasion, Manatt overheard a coworker tell Bill Gilmore, Manatt's supervisor, that "I am not a China man, I'm not like China man with their eyes like that." *Id*. Gilmore smiled at the comment. *Id.* Another time, Gilmore told the plaintiff, "I've had the worst kind of trouble with your countrymen." *Id.* Later,

---

[19] In its moving papers, the City conceded that Short's "boy" comments may survive the statute of limitations given the time-frame.

the plaintiff overheard a conversation in which coworkers Barbara Green and Vincent Correia were laughing and saying "China man" and "rickshaw." *Id*. Observing plaintiff, they pulled their eyes back with their fingers in an attempt to imitate and mock the appearance of Asians. *Id.* Correia's cubicle, "often the source of racially offensive jokes," was next to Manatt's cubicle. Manatt heard the phrase "China man" when jokes were told on several occasions. *Id*. She heard Correia laugh when a coworker referred to the Chinese as those "communists from Beijing." *Id*.

Finally, the "most offensive" incident occurred when Manatt mispronounced the word "Lima." The court explained:

> That day, Manatt approached Barbara Green with some documents concerning a transaction in Lima, Peru. In describing the documents to Green, Manatt mispronounced 'Lima.' Rather than ignore the mispronunciation or tactfully correct Manatt, Green informed Manatt that her enunciation was 'ridiculous.' Manatt then left, but Green refused to drop the issue. Green proceeded to place a telephone call to Peo, a Bank employee from Peru. After contacting Peo, Green shouted to Manatt: 'China woman, China woman, China woman, get your butt over here.' Shocked, Manatt returned to Green's cubicle. Green then informed Manatt of her phone call to Peo and demanded that Manatt pronounce 'Lima' for Peo to hear.
>
> By this time, Correia was also present. Manatt again mispronounced 'Lima,' and Peo corrected her. While this occurred, Green and Correia laughed, attributing [Plaintiff's] mispronunciation to her Chinese ethnicity. Several times they jokingly stated: 'That's because she's a China woman.'

*Id*. at 795-76. Notwithstanding these unpleasant events, the Ninth Circuit concluded that the "co-workers' and supervisor's offensive actions were neither severe nor pervasive enough to alter the conditions of Manatt's employment" and affirmed the district court's grant of summary judgment. The court indicated that the

outcome may have been different with additional facts:

> We are certainly troubled by the 'Lima incident' and by
> the racially offensive gesture made by Green and Correia.
> We also recognize that these events caused Manatt to
> suffer pain. If these actions had occurred repeatedly,
> Manatt may very well have had an actionable hostile
> environment claim. But these two regrettable incidents
> occurring over a span of two-and-a-half years, coupled
> with the other offhand remarks made by Manatt's
> co-workers and supervisor, did not alter the conditions
> of Manatt employment. Her hostile work environment claim
> must fail.

*Id.* at 799 (footnote and internal citation omitted). *Manatt* is

materially distinguishable. In *Manatt*, the bulk of the harassing

acts were from coworkers. The supervisor uttered only one comment

"I've had the worst kind of trouble with your countrymen" and he

smiled in response to another. *Id.* at 795. In this case, by

contrast, we have multiple racial statements from two different

supervisors (Little and Short) and another individual (Peyton) who

had some level of indirect supervisory authority over Plaintiff.

And the racial statements Plaintiff experienced were of a different

quality than the "offhand remarks" in *Manatt*.[20]

_____

[20] The City also cites *Sanchez v. City of Santa Ana*, 936 F.3d
1027 (9th Cir. 1990) as an example of case where harassing conduct
was not enough to create a hostile work environment. *Sanchez*,
however, is not altogether helpful. The court did not specify the
nature of the "racially offensive slurs" or the "racially
offensive" "cartoon" in the case or otherwise elaborate on the
nature of the harassing incidents. *Id*. The court described the
incidents in generic terms and often referred to what was "alleged"
or "claim[ed]." *Id*. at 1031. The hostile work environment claim was
submitted to a bench trial and the district court granted a
directed verdict in favor of the defendant. In affirming the
directed verdict, the court did not provide an extended analysis on
the hostile work environment claim. The court simply stated: "We
cannot say that the district court's ultimate conclusion, that the

71

The City notes, and it is true, that the FEHA, like Title VII, is not a civility code. *Lyle*, 38 Cal. 4th at 295. And some acts in this case, including the "holder thingie" e-mail, are bereft of racial overtones. That being said, the numerous racial comments discussed above are more than just uncivil.

The City also notes that Plaintiff has not sought employment outside the Water Division since 2002, and to the City, this cuts against Plaintiff's hostile work environment claim. An employee, however, need not quit or leave under circumstances amounting to a constructive discharge in order to preserve a viable hostile work environment claim. *Cf. Manatt*, 339 F.3d at 804 (recognizing that a constructive discharge claim and a hostile work environment claim are not equivalent because a constructive discharge claim imposes a "higher standard").

Plaintiff has created a triable issue as to whether he experienced harassment of a racial nature that was so severe or pervasive as to alter the conditions of employment and create an abusive work environment that continued into the limitations period.[21]

---

plaintiffs failed to prove the existence of a discriminatory atmosphere, is incorrect as a matter of law." *Id*. at 1037. Absent more information on the nature of the incidents involved and an articulated analysis as to why the hostile work environment claim failed, the analogical value of *Sanchez* is not clear and does not warrant a grant of summary judgment in favor of the City especially in light of a subsequent FEHA case like *Dee*.

[21] A triable issue exists independent of the "additional harassing conduct" Plaintiff identifies and the "holder thingie" e-mail.

### b. Continuing Violation Doctrine

The next question is to what extent Plaintiff can rely on acts of harassment that occurred outside the limitations period, *i.e.*, before August 21, 2005, in support of his hostile work environment claim. Plaintiff invokes the continuing violation doctrine to reach racial comments outside the limitations period.

"The continuing violation doctrine is arguably the most muddled area in all of employment discrimination law." *Alch v. Superior Court*, 122 Cal. App. 4th 339, 365 (2004). The continuing violation doctrine "comes into play when an employee raises a claim based on conduct that occurred in part outside the limitations period." *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 812 (2001). In such cases, "an employer [is] liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period." *Id*.

To invoke the continuing violation doctrine in FEHA cases, the employee must show: (1) that the conduct that occurred within the limitations period is sufficiently similar in kind to the conduct that falls outside the period; (2) that the conduct has occurred with reasonable frequency; and (3) that the conduct did not acquire a degree of permanence such that the employee was on notice that further efforts at informal conciliation with the employer to obtain accommodation or end harassment would be futile. *Richards*, 26 Cal. 4th at 802; *see also Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1059 & n.19 (2005); *Dominguez v. Washington Mut. Bank*, 168 Cal. App. 4th 714, 721 (2008). "Permanence" in this context

means "that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." *Yanowitz*, 36 Cal. 4th at 1059 n.19 (internal quotation marks omitted).

If all the elements of the continuing violation doctrine are met (*i.e.*, if a triable issue exists as to each element), the "harassment should be viewed as a single, actionable course of conduct," *Richards*, 26 Cal. 4th at 802. At summary judgment, if there is a triable issue as to each of these elements, a court cannot conclude that the continuing violation doctrine "is inapplicable as a matter of law." *Yanowitz*, 36 Cal. 4th at 1060.

Here, with respect to racial comments, the acts at issue are sufficiently similar in kind, appear to have been reasonably frequent, and had not acquired permanence before the statutory period.

In terms of similarity in kind, "similar kinds" of conduct, "such as acts of harassment" may "take a number of different forms." *Richards*, 26 Cal. 4th at 823. The identified racial statements at issue here, ranging from the mid-1990's to potentially within the limitations period,[22] are similar in that they were verbal, racially-based and discriminatory against African-Americans. While they ranged in terms of severity and took

---

[22] The word "potentially" is used because, as discussed above, there is a triable issue of fact as to whether the hostile work environment continued into the limitations period (this has not been conclusively established).

different forms, the racist nature of these statement provides a common thread.  On some level, similarity can also be found in the general context – all these statements were uttered in Plaintiff's workplace as opposed to some conference or employer-sponsored function.  Although the statements were uttered by different individuals, this alone does not, as a matter of law, render the continuing violation doctrine inapplicable.  Alongside the more recent "boy" comments from Short, Plaintiff declares that racist comments have occurred throughout his employment and they continue to persist.  Plaintiff has created a triable issue as to whether the racial statements prior to the limitations period were sufficiently similar in kind to the racial statements potentially within the limitations period, including the "boy" comments.

In terms of reasonably frequency, identified comments occurred in the mid-1990's ("white power"), late 1990's and early 2000s (including "there are niggers and then there are blacks"), and the 2004-2006 time frame ("boy").  There are also identified comments for which no specific time-frame is discernable from the present record, including Little's comment "if you can't get your niggers to do this, I'll get mine" and Fey's "Schwarzenigger" comment that occurred sometime during Fey's employment with the City.  Coupled with these identified comments, Plaintiff states in his declaration that he has been subject to racist comments throughout his employment and they continue to persist.  This statement is consistent with Plaintiff's deposition testimony where he described the "black man" utterance as an example of the "little incidents" that made his life a "living hell."  And, on some level, this

statement is consistent with Montgomery's explanation of the workplace as an environment where "rumors and discussion go, and you hear things" and Montgomery does not know if there is a basis for them (and that is why he did not investigate a "nigger" comment).  Montgomery's testimony is suggestive of a workplace rife with banter and remarks.  Given the record evidence, Plaintiff has created a triable issue as to whether the racial comments, including those identified above, occurred with reasonable frequency.

Finally, in terms of permanence, on certain occasions, racist comments were investigated including the "slave" comment and the "black man" comment.  By taking it seriously and investigating the conduct, the employer does not communicate a message that efforts to end the harassment will be futile.  Moreover, Peyton, who uttered several remarks, left the City's employ in 2002.  His departure cuts against the creation of permanence.  In addition, on several occasions, Plaintiff was able to quell further escalation.  After Peyton uttered the "Schwarzenigger" comment, Plaintiff inquired as to what he said and Peyton "got quiet and that was it."  Plaintiff "shut down" Little from continuing on with his conversation in which he said "there are blacks and then there are niggers."  Finally, Plaintiff also corrected two coworkers who called him "boy."  While, at times, Plaintiff may have entertained notions that the harassment would not stop, it cannot be said, as a matter of law, that the racial harassment prior to the limitations cutoff reached a degree of permanence such that it would have been clear to a reasonable employee in Plaintiff's

position that further efforts to end the harassment would be futile.

Because Plaintiff has created a triable issue on each of the three elements, for purposes of summary judgment, the racial statements from the mid-1990's onward are properly viewable as creating a potentially viable, single, actionable hostile work environment. *Richards*, 26 Cal. 4th at 802.

The continuing violation doctrine does not, however, sweep in two events which Plaintiff believes were harassing. The "holder thingie" e-mail and the sick leave incident with Montgomery. In his opposition to the City's motion, Plaintiff submitted briefing on why the continuing violation doctrine applies to the racial comments in this case. He, however, made no argument that the continuing violation doctrine should apply to the "holder thingie" e-mail and the sick leave incident. Any such argument would be erroneous in any event.

The "holder thingie" e-mail is electronic communication that is bereft of racial innuendo and is not sufficiently similar to the other verbal racial comments in this case which form the basis of a viable claim. The sick leave incident is similarly bereft of racial overtones and, moreover, is a discrete employment event, not an offensive verbal utterance. The sick leave incident is not sufficiently similar to the other racial comments in this case. Accordingly, the continuing violation doctrine cannot be invoked with respect to these events. While these events cannot be used as substantive components that compromise Plaintiff's hostile work

environment claim, whether they can be used for other purposes is beyond the scope of this order.


## V. <u>EVIDENTIARY OBJECTIONS</u>

The City filed various objections to evidence submitted by Plaintiff in his opposition. One objection, on the grounds of authenticity, went to all the deposition testimony excerpts that Plaintiff's counsel attached to his declaration.  The court permitted counsel to amend his declaration to resolve the authenticity issue. (Doc. 43.)  This authenticity objection is overruled.

The City also objects to certain paragraphs of Plaintiff's declaration, including, among others, paragraph twenty-two (22) and twenty-three (23).  As to the former, Plaintiff can state in his declaration, just as he can testify, that he has heard racial comments throughout his employment and they continue to persist. He has personal knowledge of such comments, and he has provided numerous examples of them.  To the extent the objection goes to that statement, the objection is denied.  In terms of the latter paragraph, Plaintiff can state in his declaration, just as he can testify, that he has heard racial comments at his place of work including the comment "If you can't get your niggers to do this, I'll get mine."  He has personal knowledge of such comments.  A hearsay objection lacks merit because the racial comments are not being offered for, and are relevant without regard to, the truth of their content; rather, they are relevant, at a minimum, to show the

effect on the hearer (Plaintiff). To the extent the City's objection goes to that statement, it is denied. In denying summary judgment on the FEHA harassment claim, the court did not rely on any other matter in Plaintiff's declaration. The City's remaining objections to Plaintiff's declaration are denied as moot.

The City also objects to certain exhibits attached to the declaration of attorney Gavin, including Exhibit H, which is a copy of the "documentation" or web searching regarding the word "niggardly." This documentation was specifically referred to and covered in Plaintiff's deposition, the transcript of which the City included in their moving papers. (Pl. Dep. 190-193.) At a minimum, it is relevant for background, which is how it has been used in this order. The City's objection is denied. The other exhibits to which the City objects, Exhibits C and D, played no role in this order. The objection to these exhibits is denied as moot.

## VI. CONCLUSION

For the reasons discussed above:

1. Summary judgment on Plaintiff' Title VII disparate impact claim is GRANTED in favor of the City.

2. Summary judgment on Plaintiff's Title VII disparate treatment claim is GRANTED in favor of the City.

3. Summary judgment on Plaintiff's Title VII retaliation claim is GRANTED in favor of the City.

4. Summary judgment on Plaintiff's claim under § 1981 is GRANTED in favor of the City.

79

**5. Summary judgment on Plaintiff's FEHA discrimination claim is GRANTED in favor of the City.**

**6. Summary judgment on Plaintiff's FEHA harassment claim is DENIED.**

Defendant shall file a proposed order conforming to this memorandum decision within five (5) days following service of this decision.

Consistent with Rule 56(d)(1), both parties shall have five (5) days following service of this decision to file a list of material facts which each party believes are not genuinely at issue for purposes of trial. If separately filed by the parties, these lists shall not exceed five pages. To the extent practicable, the parties should meet and confer to determine whether and to what extent any material facts are agreed upon for purposes of trial. Agreed upon facts should be listed in a joint filing. Any such joint filing has no page limitation.

IT IS SO ORDERED.

**Dated:    May 26, 2009**              **/s/ Oliver W. Wanger**
                                 UNITED STATES DISTRICT JUDGE